# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **FORT SILL APACHE TRIBE,** | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 14-958 (RMC) |
| **NATIONAL INDIAN GAMING COMMISSION,** *et al.*, | ) ) ) ) | |
| Defendants. | ) ) ) | |

## MEMORANDUM OPINION

This is a case that has become unduly complicated. It began when the Fort Sill Apache Indian Tribe (the Tribe), a federally recognized Indian Tribe, sued the National Indian Gaming Commission (NIGC) and Jonodev Chaudhuri, in his official capacity as Acting Chairman of the NIGC, regarding the status of the Tribe's land in Akela Flats, New Mexico. The underlying issue is the Tribe's desire to operate a casino and the 2015 Decision and Order of NIGC that the Tribe is not eligible to do so.

After some initial skirmishing, the parties asked to stay the case while they tried to reach a settlement. Months passed without apparent progress and the Court set a status conference to determine whether settlement was possible or if the litigation should proceed. At that status conference on August 15, 2016, the parties explained a structure upon which they had agreed, that might possibly, or possibly not, resolve the lands dispute. To that end, the parties proposed an order the Court might enter to ensure a more timely effectuation of the settlement structure. The parties before the Court agreed that the Department of Interior would submit a letter to NIGC outlining its opinion on the status of the lands at Akela Flats, and NIGC would

1

subsequently decide to reconsider, or not, its decision that the Tribe was ineligible to conduct gaming in New Mexico. The outcome of that proposal and this Court's Order was a letter issued by NIGC in January 2017 (2017 Decision), signed by three Commissioners, in which NIGC stated it would not reconsider and affirmed its 2015 Decision and Order (2015 Decision).

The parties returned to this litigation and the Tribe filed a Second Amended Complaint that complains of both the 2017 Decision and 2015 Decision, and added Defendants Department of the Interior (Interior) and other associated individuals (collectively, Defendants). Pending before the Court are Defendants' Motions for Reconsideration and Partial Dismissal of Plaintiff's Second Amended Complaint. Defendants insist that the 2017 Decision was not, and could not be considered, final agency action subject to challenge before a court.

## I. BACKGROUND

The parties are well aware of the facts of the case; however, because the parties' motions concern legal issues not previously considered by the Court, it recites the facts in detail.

The Fort Sill Apache Indian Tribe is a federally recognized Indian tribe. Second Am. Compl. (SAC) [Dkt. 80] ¶ 23. Originating in what is now New Mexico, the predecessors of the Fort Sill Apache were forcibly relocated in the 19th century to Florida, Alabama, and then Oklahoma by the United States Army following the conclusion of the war against the Apache leader Geronimo and his people. *Id.* ¶ 45 ("In 1886, after tribal leader Geronimo and his last warriors surrendered, the United States imprisoned the entire Chiricahua and Warm Springs Apache population (including women, children, and non-combatants) and forcibly expatriated them . . . . Conditions in the prison camps were brutal: four years after Geronimo's surrender, a quarter of the [Apache] were dead."). After 27 years of incarceration at Fort Sill in Lawton, Oklahoma, the Apache prisoners of war were given the choice in the early 20th century to

2

become members of the separate Mescalero Apache Tribe in New Mexico or to be released to live without tribal affiliation in Oklahoma. *Id*. ¶ 47. Those Apache who chose to remain in Oklahoma were resettled onto the existing Kiowa, Comanche and Apache Reservation (KCA Reservation). *Id.* These Oklahoma Apache and their descendants now comprise the Fort Sill Apache Indian Tribe. In the 1970s, the Fort Sill Apache Indian Tribe successfully undertook the then-existing Bureau of Indian Affairs (BIA) process to become federally recognized and eligible for BIA-administered programs. *Id.* ¶¶ 48-51.

In the late 1990s, the Tribe sought to open a gaming facility on land within the boundaries of the KCA Reservation. *Id.* ¶¶ 57-58. The Comanche Nation, a separate tribal entity which also held lands on the KCA Reservation, opposed that plan and sued the United States to stop it. *Id.* ¶¶ 60-61; *see Comanche Nation, Okla. v. United States (Comanche Nation)*, Case No. CIV-05-328-F (W.D. Ok. Mar. 9, 2007). The Fort Sill Apache Indian Tribe intervened in the lawsuit. SAC ¶ 61.

The United States, the Comanche Nation, and the Fort Sill Apache Indian Tribe ultimately negotiated a three-way settlement agreement effective as of March 8, 2007 (Comanche Nation Settlement Agreement). *Id.* ¶¶ 62-63. Pursuant to the Comanche Nation Settlement Agreement, the Fort Sill Apache Indian Tribe agreed to relinquish its lands on the KCA Reservation and move to a thirty-acre location in Akela Flats, New Mexico, an area within the Tribe's ancestral homeland. *Id.* ¶ 63. For its part, the government agreed to "withdraw its March 29, 1996 memorandum opinion allowing the Tribe to acquire a land base on the former KCA Reservation in Oklahoma and to enter into certain agreements that would assist the Tribe in establishing *equivalent rights* in New Mexico." *Id.* (emphasis added).

3

In Section 7 of the Comanche Nation Settlement Agreement, the parties agreed to several statements, including that the Fort Sill Apache Indian Tribe is the successor-in-interest to the Chiricahua and Warm Springs Apache Tribes with aboriginal lands in Arizona and New Mexico; that the Tribe is a federally recognized Indian tribe; and that the government agreed to process timely an application for a reservation proclamation. *Id.* ¶¶ 65-70. Years later, on November 28, 2011, the United States issued that proclamation. *Id.* ¶ 71.

Following the Comanche Nation Settlement Agreement and its relocation to New Mexico, the Tribe sought to open a gaming location on its Akela Flats territory; in late 2007, the Tribe received a Tribal Gaming Commission license for a Class II gaming facility. *Id.* ¶¶ 73-74. However, in February 2008, NIGC issued a "Warning Notice" that the Akela Flats casino might be operating in violation of the Indian Gaming Regulatory Act, 25 U.S.C. § 2701 *et seq.* (IGRA). *Id.* ¶ 75.

The Warning Notice was followed in May 2008 by a written opinion (the 2008 Opinion) by NIGC's general counsel. *Id.* ¶ 76. The 2008 Opinion concluded that the Akela Flats facility could not meet the requirements of IGRA because "the Tribe has failed to demonstrate . . . that the Tribe was acknowledged through the Federal acknowledgment process." *Id.* ¶ 78. The 2008 Opinion further stated that the Tribe had an inadequate presence in New Mexico to qualify for an exception.[1] The Tribe challenged the 2008 Opinion before the Oklahoma district court presiding over the Comanche Nation Settlement Agreement, and, ultimately, NIGC withdrew the 2008 Opinion. *Id.* ¶ 80.

---

[1] In 2014, the Supreme Court of New Mexico ordered the State of New Mexico to recognize the Tribe formally. *Fort Sill Apache Tribe v. Martinez*, No. 34,464, Order (N.M. April 14, 2014); *see also* SAC ¶ 54.

4

Following the withdrawal of the 2008 Opinion, the Tribe resumed plans to operate a gaming facility and opened a casino on April 9, 2009. *Id.* ¶ 81. A few weeks later, on April 30, 2009, NIGC's General Counsel "supplemented" the withdrawn 2008 Opinion with additional information. *Id.* ¶ 82. On July 21, 2009, NIGC issued Notice of Violation 09-35 (NOV 09-35) that ordered the Tribe to cease gaming activities. *Id.* ¶ 83. NOV 09-35 explicitly incorporated the reasoning of the (supposedly withdrawn) 2008 Opinion and its April 30, 2009 supplement. *Id.* ¶ 83.

NOV 09-35 stated that there was "no way for the Tribe to cure the alleged violation" and ordered the Tribe to cease gaming activities immediately or face civil fines of up to $25,000 per day. *Id.* ¶ 86. On September 11, 2009, NIGC informed the Tribe that it would stay imposition of civil fines if the Tribe agreed to cease gaming operations at Akela Flats during the pendency of the Tribe's appeal of NOV 09-35. *Id.* ¶ 87. Soon after, the Tribe closed the Akela Flats facility. *Id.* ¶ 88.

The Tribe timely appealed NOV 09-35 to the full NIGC. *Id.* ¶ 91. Following a period of several years without receiving any ruling on that appeal, the Tribe filed its original Complaint in this matter on June 14, 2014. *Id.* ¶ 98; *see* Compl. [Dkt. 1].

On May 5, 2015, NIGC issued its 2015 Decision on the Tribe's administrative appeal of NOV 09-35. SAC ¶ 103. The 2015 Decision upheld NOV 09-35 and adopted much of the reasoning of the 2008 Opinion. *Id.* ¶ 105. Without notice of the 2015 Decision, this Court issued a Memorandum Opinion dated May 15, 2015, which held that the Court had jurisdiction to compel unreasonably-delayed agency action, and that the Tribe could proceed on that Count. *See* 5/12/2015 Mem. Op. [Dkt. 19] at 9. The Court held, however, that it did not have

jurisdiction to hear the Tribe's claim that NOV 09-35 violated the Administrative Procedure Act, 5 U.S.C. § 500 *et seq.*, because NOV 09-35 did not constitute final agency action. *Id.* at 10.

In light of the issuance of NIGC's 2015 Decision and the Court's May 2015 Memorandum Opinion, the Tribe filed a motion to amend its original Complaint, which the Court granted by Minute Order on July 20, 2015. The First Amended Complaint, *inter alia*, dropped the claim of unreasonable agency delay and reasserted the claim that NIGC had acted arbitrarily and capriciously. First Am. Compl. (FAC) [Dkt. 30] ¶¶ 1, 15-18. The Tribe also added a separate legal claim that the United States had breached the Comanche Nation Settlement Agreement. *Id.* ¶¶ 8-14.

Soon after the Tribe amended its Complaint, the parties entered into an extended period of settlement discussions, which lasted well over a year. The Tribe alleges that the Defendants proposed the following arrangement during settlement talks: (1) the Department of Interior would issue a letter providing its formal position regarding the Akela Flats' eligibility for gaming, which was indicated to be positive; (2) with that letter, NIGC would formally reconsider its 2015 Decision; and (3) pending completion of this process, the Tribe would agree to a stay of the litigation in this Court. SAC. ¶ 13. On October 14, 2015, the Court entered a minute order granting the parties' joint motion to stay litigation.

The stay was extended several times at the request of the parties. The Court held a status conference ten months later, on August 15, 2016, to obtain an explanation. At that conference, the parties proposed that the Court enter an Order to memorialize the agreement

described above, with language supplied *by the parties*.² The next day, the parties submitted a Joint Proposed Order which read in material part:

> [T]he Department of the Interior ("Interior") shall issue a letter providing Interior's position regarding the Fort Sill Apache Tribe's gaming eligibility under the Indian Gaming Regulatory Act and certain other matters addressed in the National Indian Gaming Commission's ("NIGC") Decision and Order dated May 5, 2015, and . . . the NIGC shall reconsider its Decision and Order dated May 5, 2015, in consideration of the letter to be provided by Interior, and shall issue a Decision and Order incorporating such reconsideration.

Joint Proposed Order [Dkt. 50] at 1.

The Court entered an Order substantively similar to that Proposed Order.³ *See* Order [Dkt. 51]. While this Order underwent some revisions throughout the fall of 2016, the above-quoted language remained materially unchanged. The final iteration of the Order, which again substantively incorporated language jointly requested by the parties, was entered on October 21, 2016. *See, e.g.*, Order Granting Mot. to Amend [Dkt. 60].

The Defendants certified on December 9, 2016 that Interior had furnished NIGC with a letter. *See* Notice [Dkt. 63]. On January 12, 2017, NIGC issued the 2017 Decision stating, in material part, that the letter from the Department of the Interior did not provide grounds for reconsideration of the 2015 Decision. The nature of the 2017 Decision constitutes the basis for much of the immediate litigation. When the Tribe challenged the 2017 Decision as

---

² At the status conference, counsel for the Tribe asked "…if we might not all benefit from a court order saying a letter will issue [from Interior] and the NIGC will reconsider or not its decision by say September 30th or show cause why not." 8/15/16 Hr'g Tr. 6:04-06 [Dkt. 61]. Counsel for the Defendants agreed and said that "Interior's goal is to maintain the way forward." *Id*. 6:17-7:22. Defendants then proposed a timeline for the requirements of the proposed order, which the Court lightly condensed to ensure that the process would move forward after the months of delay.

³ The Court further ordered that the case remain stayed pending the proposed process.

inadequate under the terms of the Court's Order and the parties' agreement, the government opposed, and the Court ruled that, based on Defendants' representations, they had met the terms of the agreement and were therefore in compliance with the Court's Order. *See* 2/17/2017 Mem. Op. [Dkt. 70].

In light of those events, the Tribe moved to amend its First Amended Complaint, in order to, *inter alia*, add a claim that the 2017 Decision was arbitrary and capricious. *See* Mot. to Amend [Dkt. 74]; SAC. ¶¶ 165-171. The Defendants opposed, arguing that the 2017 Decision did not constitute final agency action subject to review. *See* Defendants' Memorandum in Opposition to Motion to Amend [Dkt. 77] at 9-17. After hearing oral argument, the Court granted the Tribe's Motion to Amend by minute order dated July 7, 2017. The Defendants have now filed a combined Motion to Dismiss the Second Amended Complaint and Motion to Reconsider the Court's July 7, 2017 Minute Order [Dkt. 84] (Defs.' MTD). The Tribe has opposed, *see* Plaintiff's Memorandum in Opposition to Motion to Dismiss [Dkt. 87] (Pltf's Opp'n), and the Defendants have replied, *see* Defendants' Reply to Opposition to Motion to Dismiss [Dkt. 92] (Defs.' Reply). The issues are ripe for decision.

## II.  LEGAL STANDARDS

**A. Lack of Subject Matter Jurisdiction under Rule 12(b)(1)**

A federal court may not hear a claim if it lacks the jurisdiction to do so. Federal Rule of Civil Procedure 12(b)(1) provides for the dismissal of claims where a court lacks subject matter jurisdiction over them. No action of the parties can confer subject matter jurisdiction on a federal court because subject matter jurisdiction is both a statutory requirement and an Article III requirement. *Akinseye v. District of Columbia*, 339 F.3d 970, 971 (D.C. Cir. 2003). The party claiming subject matter jurisdiction bears the burden of demonstrating that such jurisdiction

8

exists. *Khadr v. United States*, 529 F.3d 1112, 1115 (D.C. Cir. 2008); *see Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (noting that federal courts are courts of limited jurisdiction and "[i]t is to be presumed that a cause lies outside this limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction") (citations omitted).

When reviewing a motion to dismiss for lack of jurisdiction under Rule 12(b)(1), a court should "assume the truth of all material factual allegations in the complaint and 'construe the complaint liberally, granting plaintiff the benefit of all inferences that can be derived from the facts alleged.'" *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (quoting *Thomas v. Principi*, 394 F.3d 970, 972 (D.C. Cir. 2005)). A court has "broad discretion to consider relevant and competent evidence" to resolve factual issues raised by a Rule 12(b)(1) motion. *Finca Santa Elena, Inc. v. U.S. Army Corps of Engineers*, 873 F. Supp. 2d 363, 368 (D.D.C. 2012) (quoting 5B Charles Wright & Arthur Miller, Fed. Prac. & Pro., Civil § 1350 (3d ed. 2004)); *see also Macharia v. United States*, 238 F. Supp. 2d 13, 20 (D.D.C. 2002), *aff'd*, 334 F.3d 61 (2003) (in reviewing a factual challenge to the truthfulness of the allegations in a complaint, a court may examine testimony and affidavits). In these circumstances, consideration of documents outside the pleadings does not convert the motion to dismiss into one for summary judgment. *Al-Owhali v. Ashcroft*, 279 F. Supp. 2d 13, 21 (D.D.C. 2003).

**B. Failure to State a Claim under Rule 12(b)(6)**

A motion to dismiss for failure to state a claim challenges the adequacy of a complaint on its face. Fed. R. Civ. P. 12(b)(6). A complaint must be sufficient "to give a defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citing *Conley v. Gibson*, 355 U.S. 41, 45 (1957)).

9

Although a complaint does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id*. A court must treat the complaint's factual allegations as true, "even if doubtful in fact," *id.*, but a court need not accept as true legal conclusions set forth in a complaint, *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is "plausible on its face." *Twombly*, 550 U.S. at 570. A complaint must allege sufficient facts that would allow the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678-79. In deciding a motion under Rule 12(b)(6), a court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits or incorporated by reference, and matters of which the court may take judicial notice. *See Abhe & Svoboda, Inc. v. Chao*, 508 F.3d 1052, 1059 (D.C. Cir. 2007).

### C. Motion for Reconsideration

Federal Rule of Civil Procedure 54(b) states that "any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties . . . may be revised at any time before the entry of judgment adjudicating all the claims." Reconsideration is appropriate where the Court has "'patently misunderstood a party, has made a decision outside the adversarial issues presented to the Court by the parties, has made an error not of reasoning but of apprehension, or where a controlling or significant change in the law or facts has occurred since the submission of the issue to the Court.'" *Singh v. George Washington Univ.*, 383 F. Supp. 2d 99, 101 (D.D.C. 2005) (quoting *Cobell v. Norton*, 224 F.R.D. 266, 272 (D.D.C. 2004)). "The burden is on the movant to show

that some harm would accompany a denial of the motion to reconsider." *Powers-Bunce v. District of Columbia*, 576 F. Supp. 2d 67, 69 (D.D.C. 2008).

### III. ANALYSIS

The Second Amended Complaint alleges four separate Counts: Count 1 alleges that the 2015 Decision was arbitrary and capricious; Count 2 alleges that NIGC acted arbitrarily and capriciously in forcing the Tribe to close its Akela Flats gaming facility; Count 3 alleges that the Defendants breached the Comanche Nation Settlement Agreement; and Count 4 alleges that the 2017 Decision was arbitrary and capricious. The Defendants move to dismiss Counts 2, 3, and 4. Specifically, they move to dismiss Count 2 for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6)[4]; Count 3 for lack of jurisdiction under Rule 12(b)(1) and for failure to state a claim under Rule 12(b)(6); and Count 4 for failure to state a claim under Rule 12(b)(6).

### A. Count 2

The Tribe's Count 2 alleges that NIGC's actions to force closure of the Akela Flats casino were arbitrary and capricious. SAC ¶¶ 147-51. Upon issuing NOV 09-35, the

---

[4] In their Motion to Dismiss, Defendants appear to argue that Count 2, not Count 3, should be dismissed for lack of jurisdiction. Defs.' MTD at 20. However, the context of their argument indicates that they intended it to apply to the Tribe's Count 3. *See id.* ("Plaintiff's Count 2—that Defendants breached the Comanche Settlement Agreement—is not properly before this Court."). The Court therefore construes the Defendants to be moving to dismiss Count 3 for lack of jurisdiction and not Count 2. Even if Defendants did seek to have Count 2 dismissed for lack of jurisdiction, however, their argument would fail. Count 2 alleges a violation of the APA, over which the Court has jurisdiction pursuant to 28 U.S.C. § 1331. The APA further grants a waiver of sovereign immunity. *See* 5 U.S.C. § 702 ("An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party."). To the extent that Defendants argue that Count 2 does not challenge final agency action or is otherwise not reviewable under the APA, it is appropriately assessed under Rule 12(b)(6), not 12(b)(1). *See Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*, 324 F.3d 726, 731 (D.C. Cir. 2003) ("[T]he requirement of final agency action is not jurisdictional . . .").

11

Acting Chair of NIGC informed the Tribe that there was "no way for the Tribe to cure" the alleged violations. *Id.* ¶ 148. When the Tribe administratively appealed NOV 09-35, the Commission issued the 2015 Decision, sustaining the violations. The Court has previously ruled that issuance of NOV 09-35 did not constitute final agency action subject to review, despite the Tribe's subsequent closure of the Akela Flats casino. *See* 5/12/2015 Mem. Op. Count 1 of the Complaint, which Defendants do not move to dismiss, alleges that the 2015 Decision was arbitrary and capricious and otherwise in violation of the APA.

The question as to Count 2 is whether it makes out a separate claim regarding the closure of the Akela Flats casino that can be attributed to NIGC. It does not.

As the Tribe admits, the Tribe closed the Akela Flats facility on its own due to the threat of potential fines that could accrue during the appeal of the 2015 Decision. NIGC issued no other formal notices or orders to the Tribe, such as a closure order, which it had the legal authority to do. To the extent NIGC's actions are amenable to review, such review must be based on final agency action—the 2015 Decision—but not the preliminary NOV. Therefore, any cognizable harms claimed in Count 2 are already pled in Count 1. Count 2 will be dismissed.

**B. Count 3**

***1. Lack of Jurisdiction under Rule 12(b)(1)***

Defendants assert that the Tribe cannot bring Count 3 in this Court, alleging breach of the Comanche Nation Settlement Agreement, because it has not established a waiver of sovereign immunity with respect to the alleged breach of contract and because this Court lacks subject matter jurisdiction over such a claim.

In bringing a claim against the United States, a plaintiff must identify an unequivocal waiver of sovereign immunity and an affirmative grant of subject matter

jurisdiction. *FAA v. Cooper*, 566 U.S. 284, 291 (2012) (requiring "an unmistakable statutory expression of congressional intent to waive the Government's immunity"); *see also Yee v. Jewell*, 228 F. Supp. 3d 48, 53 (D.D.C. 2017) ("In suits against the government, subject-matter jurisdiction turns on at least two different jurisdictional questions. First, has Congress provided an affirmative grant of subject-matter jurisdiction? And, second, has Congress waived the United States's immunity to suit?") (citations omitted). The Tribe argues that this Court has subject matter jurisdiction over Count 3 because *Kokkonen v. Guardian Life Ins. Co. of America* permits it to exercise ancillary jurisdiction over the breach of contract claim, pursuant to its jurisdiction over the IGRA and APA claims. *See* 511 U.S. 375. In *Kokkonen*, the Supreme Court held that, without embodiment of a settlement agreement into a federal district court's dismissal order, enforcement of that agreement must rest with state courts. *Id*. at 381-82. The D.C. Circuit has recognized *dicta* in *Kokkonen* to the effect that a district court can retain jurisdiction to enforce a settlement agreement by incorporating express language in its dismissal order that states such an intention.[5] As applicable here, the District Court for the Western District of Oklahoma retained jurisdiction over the Comanche Nation Settlement Agreement by including such a provision in its dismissal order. *See* Order Approving Agreement of Compromise and Settlement, *Comanche Nation, Okla. v. United States*, Case No. CIV-05-328-F, Dkt. 82 at 1 (W.D. Ok. Mar. 9, 2007) ("It is also ordered, adjudged, and decreed that . . . the Court shall retain jurisdiction to enforce the terms of the Agreement against any party or parties under the authority of *Kokkonen*.") (citation omitted). The Tribe provides no support for its

---

[5] *See United States v. Franklin-Mason*, 742 F.3d 1051, 1055 (D.C. Cir. 2014) ("The [*Kokkonen*] Court indicated in dicta that a federal district court retains jurisdiction to enforce a settlement agreement if it either incorporates the settlement agreement into the dismissal order or specifically includes a clause in the dismissal order retaining jurisdiction." (citing *Kokkonen*, 511 U.S. at 381)).

13

position that the order retaining jurisdiction to enforce the Comanche Nation Settlement Agreement issued by the District Court for the Western District of Oklahoma confers any authority on this Court to exercise such jurisdiction. The *Kokkonen* dicta cannot be stretched to spread jurisdiction over a settlement, retained by the district court that approved the settlement, to any other district court before whom the issue may arise.[6]

As this Court finds that it does not have subject matter jurisdiction over the breach of contract claim, it is unnecessary to reach sovereign immunity or Rule 12(b)(6) arguments raised by Defendants with respect to that claim. Count 3 will be dismissed.

### C. Count 4

As a precursor to moving to dismiss Count 4, the Defendants ask the Court to reconsider its July 7, 2017 Minute Order, which granted the Tribe leave to amend its First Amended Complaint to add Count 4; more specifically, Defendants ask the Court to reconsider its implied finding that the 2017 Decision was reviewable final agency action. A motion to amend should not be granted if, *inter alia*, "the proposed claim would not survive a motion to dismiss." *Berry v. Coastal Int'l Sec. Inc.*, No. 12-1420, 2015 WL 13216805, *2 (D.D.C. July 24, 2015) (citing *James Madison Ltd. v. Ludwig*, 82 F.3d 1085, 1099 (D.C. Cir. 1996)). In granting the Tribe's motion to amend, the Court effectively ruled that Count 4 would survive a motion to dismiss. The Defendants therefore ask the Court to reconsider that earlier ruling, and, upon such reconsideration, dismiss Count 4.

---

[6] The Tribe itself recognized continuing jurisdiction in the Western District of Oklahoma over the Comanche Nation Settlement Agreement as it tried twice to enforce the agreement (on other bases) in that venue.

14

Count 4 alleges that the 2017 Decision was arbitrary and capricious. By allowing the Tribe to amend its First Amended Complaint to add Count 4, the Court preliminarily ruled that the Tribe could state a claim upon which relief can be granted. Leave to amend should not be allowed when a proposed amendment would be "futile." *See Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930, 945 (D.C. Cir. 2004) (stating that a "district court has discretion to deny a motion to amend on grounds of futility where the proposed pleading would not survive a motion to dismiss") (abrogated on other grounds by *Perry Capital LLC v. Mnuchin*, 848 F.3d 1072 (D.C. Cir. 2017)). The Court applies the same standard to a motion to amend and a motion to dismiss. *See In re Interbank Funding Corp. Sec. Litig.*, 629 F.3d 213, 215-16 (D.C. Cir. 2010) (holding that futility review on a motion to amend is functionally "identical to review of a Rule 12(b)(6) dismissal based on the allegations in the amended complaint"). The Defendants move the Court to reconsider this decision, and, upon doing so, dismiss Count 4. Defendants advance several arguments to support their position.

At base, Defendants insist for various reasons that the 2017 Decision does not, and cannot, constitute final agency action. If they are right, the Tribe cannot state a claim that the 2017 Decision was arbitrary and capricious. *See Bennett v. Spear*, 520 U.S. 154, 177-78 (1997). While it did not issue a formal ruling on the question, the Court indicated in open court that it understood the 2017 Decision to constitute final agency action and subsequently granted the Tribe's motion to amend. *See* July 7, 2017 Minute Order.

Most of Defendants' arguments demeaning the 2017 Decision can be resolved by answering two related questions: (1) can federal agencies voluntarily reopen regulatory proceedings, and, upon doing so, create new reviewable final agency actions; and (2) does the Tribe adequately allege that did NIGC did so here?

15

As to the first question, precedent in the D.C. Circuit unequivocally holds that agencies are empowered to reopen administrative processes and that such activity is judicially reviewable. "If for any reason [an] agency reopens a matter and, after reconsideration, issues a new and final order, that order is reviewable on its merits, even though the agency merely reaffirms its original decision." *Sendra Corp. v. Magaw*, 111 F.3d 162, 167 (D.C. Cir. 1997) (citing *Interstate Commerce Commission v. Bhd. of Locomotive Engineers*, 482 U.S. 270, 278 (1987)). "The new order is, in other words, final agency action and as such, a new right of action accrues." *Id; see also Harris v. FAA*, 353 F.3d 1006, 1011 (D.C. Cir. 2004).

As to the second question, the Tribe has adequately pled that the 2017 Decision was final agency action. The 2017 Decision was the culmination of a process jointly agreed upon by the parties on a timeline ordered by the Court, in which NIGC would "reconsider its prior Decision and Order dated May 5, 2015, in consideration of the letter to be provided by Interior, and shall issue a Decision and Order incorporating such reconsideration." Order Granting Mot. to Amend. In light of the clarity of Circuit precedent and the parties' stated intentions, the Defendants' arguments lose all force.

First, the plain language quoted above from this Court's Order states that the final product of the process discussed for a year was to be a "Decision and Order" with the same import as the 2015 Decision. That language was jointly proposed by the parties and entered as an Order to facilitate the resolution of this dispute, at the parties' own behest. Defendants offer no alternative reading of this language or any other explanation of its intention or of the Court's orders to the same effect, entered at the joint requests of the litigating parties. To the contrary, NIGC asserted vigorously that its 2017 Decision, in the form of a letter, fulfilled the terms of the parties' agreement; the Court took those assertions at face value and assumed good faith; and the

16

Court then concluded that the NIGC letter should be deemed the anticipated 2017 Decision and Order required by the parties' agreement and the Court's orders. *See* 2/17/2017 Mem. Op. Thus, as in *Sendra Corp. v. Magaw*, when "after reconsideration, [an agency] issues a new and final order, that order is reviewable on its merits, even though the agency merely reaffirms its original decision." 111 F.3d at 167.

In seeking to avoid this conclusion, the Defendants misread the procedural history of this prolonged litigation. Both parties thought settlement talks might be fruitful and jointly sought a stay. When no progress appeared to be forthcoming, the Court held a status conference at which both parties described the process upon which they had already agreed, *i.e.*, an opinion from Interior on the status of Akela Flats and possible reconsideration by NIGC, but also explained that it was stymied within the bureaucracy. Both parties then agreed that a Court-ordered schedule would help to accomplish this reconsideration. In furtherance of this idea, the parties submitted a proposed order to the Court which, as amended from time to time in non-substantive ways, set out a timetable. The entire purpose of the exercise was to present new and official information from Interior to NIGC upon which NIGC might reconsider the 2015 Decision. Such voluntary reconsideration by the agency certainly implies no ruling by the Court that NIGC's original decision was arbitrary, capricious, or otherwise not in accord with the law.

The Defendants further insist that the 2017 Decision cannot be final agency action because it does not comply with the parameters for final agency action set out by IGRA, 25 U.S.C. §§ 2710-14. Whatever the merits of the argument in general, it is inapposite here, because this final agency action was issued pursuant to the parties' agreement to seek administrative reconsideration rather than continuing the litigation. The parties spent the better part of a year negotiating over how to resolve this case. The result of those negotiations was the

17

adoption of a process that allowed Interior to state its views to NIGC and NIGC to consider that opinion and issue a "decision and order." By mutual agreement and by Court order, that is what happened and final agency action resulted. There can be no doubt that NIGC intends to speak no further.

For similar reasons, the Defendants' argument that the 2017 Decision cannot constitute final agency action because NIGC did not abide by the appropriate procedures specified in the Federal Register fails. At best, an agency's failure to follow its own procedures is grounds for considering a decision arbitrary and capricious, not grounds for precluding judicial review. If an agency could avoid judicial review simply by ignoring its own procedures and then pointing to its own failures, there would be little left to judicial review. Having found that the Tribe has adequately pled that the 2017 Decision constitutes final agency action subject to review, the Court will refrain from addressing whether it violated particular procedures or agreements and may be invalid. Such matters are best addressed with a full administrative record and briefing.

The Court will grant the Motion to Reconsider the Court's July 7, 2017 Minute Order and upon reconsideration will deny the Motion to Dismiss Count 4.

**D. Motion to Compel**

The Tribe moves to compel the Defendants to produce the administrative record for the 2017 Decision. In July 2017, the Defendants represented that they were determining which documents comprise that administrative record. *See* Defs.' 7/31/2017 Status Report [Dkt. 85] at 2. There has been more than ample time to do so over the last ten months.

Having reaffirmed on reconsideration that the 2017 Decision constitutes final agency action subject to challenge in court, the Court will order the Defendants to produce the

administrative record for the 2017 Decision, including any privilege log, within fourteen days of the date of this order. The Tribe's motion to compel will be denied as premature.

## IV. CONCLUSION

The Court will grant in part and deny in part the Motion to Dismiss [Dkt 84] and will grant the Motion for Reconsideration [Dkt. 84]. The Court will dismiss Count 2 for failure to state a claim, and Count 3 for lack of subject matter jurisdiction. After reconsideration, the Court will deny the Motion to Dismiss Count 4. The Court will deny the Tribe's Motion to Compel Production [Dkt. 93] as premature. The Defendants will be ordered to file the administrative record for the 2017 Decision, with a privilege log if any, within fourteen (14) days of the date of this order. The parties will also be ordered to meet and confer and, no later than 14 days after the filing of the administrative record, submit a proposed schedule for further proceedings. A memorializing Order accompanies this Memorandum Opinion.

Date: May 25, 2018                              /s/
                                        ROSEMARY M. COLLYER
                                        United States District Judge