BRIAN COLLINS
Trial Attorney
Natural Resources Section
Environment and Natural Resources Division
United States Department of Justice
P.O. Box 7611
Washington, D.C.  20044-7611
Email: brian.m.collins@usdoj.gov
Ph:  (202) 305-0428
Fx: (202) 305-0506

*Attorney for Federal Defendants*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **FORT SILL APACHE TRIBE,** | No.:  1:14-cv-000958-RMC |
| **Plaintiff,** | |
| **vs.** | **FEDERAL DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** |
| **NATIONAL INDIAN GAMING COMMISSION, *et al*.,** | |
| **Defendants.** | |

# TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................................................... 1

II.   BACKGROUND ............................................................................................................. 2

      A.    Factual Background .............................................................................................. 2

            1.    Fort Sill Apache History .......................................................................... 2

            2.    The Akela Flats parcel ............................................................................. 3

            3.    The May 2008 Opinion ............................................................................ 4

            4.    The April 2009 Opinion ........................................................................... 4

            5.    The May 2015 Decision and Order ......................................................... 4

      B.    Statutory Background ........................................................................................... 5

            1.    IGRA Exceptions to Prohibitions on Gaming ......................................... 5

            2.    25 C.F.R. Part 83 Regulations governing federal
                  acknowledgment ...................................................................................... 7

            3.    25 C.F.R. Part 292 Regulations implementing IGRA ............................. 9

III.  STANDARD OF REVIEW ........................................................................................... 10

IV.   ARGUMENT ................................................................................................................. 11

      A.    NIGC Properly Concluded That FSA Does Not Qualify For IGRA's
            Initial Reservation Exception. ........................................................................... 11

            1.    FSA cannot qualify for the Initial Reservation Exception
                  because the Tribe was not recognized through a Federal
                  Acknowledgement Process as required by statute. ................................ 12

            2.    FSA's suggestion of a "disagreement" between Interior and
                  NIGC is irrelevant and cannot satisfy the Tribe's burden under
                  the APA. ................................................................................................. 15

      B.    NIGC Properly Determined That FSA Is Not A Restored Tribe And
            Akela Flats Is Not Restored Land For Purposes of IGRA. ................................ 16

            1.    FSA presented no evidence of termination of its recognition. .............. 17

            2.    The Akela Flats parcel was not taken into trust as part of any
                  restoration. ............................................................................................. 20

            3.    NIGC's Karuk Tribe opinion is inapposite because the Karuk
                  Tribe presented extensive evidence of termination. ............................. 21

V.    CONCLUSION .............................................................................................................. 23

## TABLE OF AUTHORITIES

**Cases**

*Balt. Gas & Elec. Co. v. Nat. Res. Def. Council*,
   462 U.S. 87 (1983) ........................................................................................................11

*Bd. of Cty. Comm'r of Kay Cty. v. Fed. Hous. Fin. Agency*,
   754 F.3d 1025 (D.D.C. 2014) ......................................................................................14

*Citizens to Pres. Overton Park, Inc. v. Volpe*
   401 U.S. 416 (1971)…..…………………………………………………………………11

*Cty. of Amador v. U.S. Dep't of the Interior*,
   872 F.3d 1012 (9th Cir. 2017) ........................................................................................7

*EarthReports, Inc. v. Fed. Energy Regulatory Comm'n*,
   828 F.3d 949 (D.C. Cir. 2016) ......................................................................................15

*Fort Sill Apache Tribe of State of Okl. v. United States*,
   477 F.2d 1360 (Ct. Cl. 1973) ..............................................................................3, 17, 18

*Fort Sill Apache Tribe v. Nat'l Indian Gaming Comm'n*,
   317 F. Supp. 3d 504 (D.D.C. 2018).................................................................................1

*Fort Sill Apache Tribe v. Nat'l Indian Gaming Comm'n*,
   345 F. Supp. 3d 1 (D.D.C. 2018) ..................................................................................15

*Fort Sill Apache Tribe v. United States*,
   19 Ind. Cl. Comm. 212 (1968)……………………………………………………………3

*Grand Traverse Band of Ottawa & Chippewa Indians v. Office of U.S. Atty. for W. Div. of Mich.*,
   369 F.3d 960 (6th Cir. 2004) .....................................................................................6, 16

*Grand Traverse Band of Ottowa and Chippewa Indians v. U.S. Atty. for W. Dist. of Mich.*,
   46 F. Supp. 2d 689 (W.D. Mich. 1999) ......................................................................6, 12

*Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*,
   920 F.3d 1 (D.C. Cir. 2019)…..…………………………………………………………13

*Koi Nation of N. Cal. v. U.S. Dep't of Interior*,
   361 F. Supp. 3d 14 (D.D.C. 2019) .........................................................................9, 14, 15

*Lujan v. Nat'l Wildlife Fed'n*,
   497 U.S. 871 (1990) ......................................................................................................10

*Mackinac Tribe v. Jewell*,
   829 F.3d 754 (D.C. Cir. 2016)......................................................................................6, 7

*Marsh v. Or. Nat. Res. Council*,
   490 U.S. 360 (1989) ......................................................................................................11

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ........................................................................................................11

*Muwekma Ohlone Tribe v. Salazar*,
   708 F.3d 209 (D.D.C. 2013)............................................................................................8

*Nielsen v. Preap*,
    139 S. Ct. 954 (2019)................................................................................................14

*Or. Nat. Res. Council v. Lowe*,
    109 F.3d 521 (9th Cir. 1997).....................................................................................10

*Providence Yakima Med. Ctr. v. Sebelius*,
    611 F.3d 1181 (9th Cir. 2010)...................................................................................11

*Scott v. United States*,
    33 Ct. Cl. 486 (1898).............................................................................................3, 18

*Seminole Tribe of Fla. v. Florida*,
    11 F.3d 1016 (11th Cir. 1994).....................................................................................5

*Stand Up for Cal.! v. U.S. Dep't of the Interior*,
    204 F. Supp. 3d 212 (D.D.C. 2016).............................................................................7

*Tex. Neighborhood Servs. v. U.S. Dep't of Health & Human Servs.*,
    875 F.3d 5 (D.C. Cir. 2017)…………………………………………………………..12

*TOMAC v. Norton*,
    193 F. Supp. 2d 182 (D.D.C. 2002).......................................................................6, 13

*TOMAC, Taxpayers of Mich. Against Casinos v. Norton*,
    433 F.3d 852 (D.C. Cir. 2006).....................................................................................6

*United States v. Cook*,
    922 F.2d 1026 (2d Cir. 1991).......................................................................................5

**Statutes**

25 U.S.C. § 2701(3)............................................................................................................5

25 U.S.C. § 2704(a)............................................................................................................7

25 U.S.C. § 2719(a)-(b).....................................................................................................5

25 U.S.C. § 2719(b)(1)(A)................................................................................................5

25 U.S.C. § 2719(b)(1)(B)..........................................................................................1, 4, 5

25 U.S.C. § 2719(b)(1)(B)(ii).....................................................................................6, 12, 14

25 U.S.C. § 2719(b)(1)(B)(iii).......................................................................................6, 16

25 U.S.C. § 2719(b)(2-3)..................................................................................................5

25 U.S.C. §§ 2701 - 2721..................................................................................................5

5 U.S.C. § 706(2)(A).......................................................................................................11

5 U.S.C. §§ 701-06...........................................................................................................10

**Regulations**

25 C.F.R. § 292..................................................................................................................9

25 C.F.R. § 292.1...............................................................................................................9

25 C.F.R. § 292.12...........................................................................................................10

25 C.F.R. § 292.6 ............................................................................................................9, 12

25 C.F.R. § 292.7 ........................................................................................................6, 10, 16

25 C.F.R. § 83.3(a) (1993) .......................................................................................................8

25 C.F.R. § 83.5(a) (1993) .......................................................................................................8

25 C.F.R. § 83.7 (1993) ...........................................................................................................8

25 C.F.R. § 83.7(a)-(c) (1993) .................................................................................................8

25 C.F.R. § 83.7(e) (1993) .......................................................................................................8

25 C.F.R. § 83.8 (1993) ...........................................................................................................8

25 C.F.R. §§ 292.3–292.12 ......................................................................................................9

25 C.F.R. Part 54 .....................................................................................................................7

25 C.F.R. Part 83 ..............................................................................2, 6, 7, 10, 12, 14, 15

43 Fed. Reg. 39361 (Aug. 24, 1978) ......................................................................................7

59 Fed. Reg. 9280 (Feb. 25, 1994) ......................................................................................7, 8

73 Fed. Reg. 29354 (May 20, 2008)...................................................................................10, 14

73 Fed. Reg. 29360 (May 20, 2008).....................................................................................10

80 Fed. Reg. 37862 (July 1, 2015)..........................................................................................7

## I.   INTRODUCTION

To echo this Court's sentiments expressed in its May 15, 2018 opinion, "[t]his is a case that has become unduly complicated." *Fort Sill Apache Tribe v. Nat'l Indian Gaming Comm'n*, 317 F. Supp. 3d 504, 506 (D.D.C. 2018).   Stripped of its long history of litigation, its historical underpinnings, and its ties to historical figures, this case presents a straightforward legal question:   Was the NIGC arbitrary and capricious in its May 5, 2015 Decision (May 2015 Decision) affirming a Notice of Violation issued against the Fort Sill Apache Tribe (FSA or the Tribe) for violating IGRA's prohibitions on gaming on tribal land?[1]   The answer is no.

NIGC's comprehensive May 2015 Decision provides clear, well-supported analysis explaining why FSA does not qualify for any of IGRA's exemptions under 25 U.S.C. § 2719(b)(1)(B).   The Tribe makes only two challenges to NIGC's May 2015 Decision: 1) that NIGC's determination that IGRA's initial reservation exception can apply only to a tribe recognized pursuant to 25 C.F.R. Part 83 was arbitrary and capricious; and 2) that NIGC's determination that the Tribe did not qualify for the restored lands exception also violated the APA.

The administrative record in this case illustrates, however, that NIGC's determinations were sound, well-supported, and well-reasoned.   FSA does not qualify for the initial reservation exception because in IGRA, Congress clearly mandated that the initial reservation exception

---

[1] Federal Defendants recognize that the Court has held that NIGC's January 2017 letter (ECF No. 67-1), was final agency action subject to challenge under the APA. *Fort Sill Apache Tribe v. Nat'l Indian Gaming Comm'n*, 317 F. Supp. 3d 504, 516 (D.D.C. 2018).   Federal Defendants are not rearguing that issue here, and respectfully reserve the right to appeal the Court's determination of that issue at an appropriate time.   The January 2017 letter, however, noted that NIGC had found no reason to disturb or revisit the May 2015 Decision.   ECF No. 67-1.   Since the NIGC's January 2017 letter did not reconsider the May 2015 Decision, the focus of Plaintiff's challenge is on the reasoning identified in the May 2015 Decision as informed by the May 2008 and April 2009 Opinions.

applies only to tribes who have been recognized pursuant to the Federal acknowledgement process in 25 C.F.R. part 83.  FSA acknowledges that it was not so recognized.  In addition, NIGC's record shows clearly that FSA failed to present sufficient evidence to demonstrate that it is entitled to the restored lands exception.  FSA did not present evidence that its government-to-government relationship was terminated.  FSA also failed to show that the Akela Flats parcel qualified as restored lands under the terms of IGRA.  Finally, there are significant factual differences between the situations of the Karuk Tribe and FSA such that the Karuk decision is entirely inapposite to FSA's claims.  In short, the Tribe has failed to carry its burden to prove that NIGC's decision violated the APA.  Accordingly, the Court should deny FSA's motion for summary judgment and grant Federal Defendant's cross-motion.

## II.     BACKGROUND

### A.     Factual Background

#### 1.     Fort Sill Apache History

The Fort Sill Apache Tribe of Oklahoma is descended from the Chiricahua and Warm Springs Apache Tribes that once inhabited large areas of the Southwest United States including parts of New Mexico.  AR003145.  With westward expansion, the United States sought to move the Apache Tribes onto reservations.  *Id*.  Some members of the tribes resisted, including an Apache warrior named Geronimo.  *Id*.  Geronimo and his group of followers fought the U.S. and Mexican armies throughout the Southwest for several years.  When Geronimo finally surrendered in 1886, the U.S. took all remaining Chiricahua Apache and made them prisoners of war in military forts and prisons in Florida.  AR003146.  The prisoners were eventually relocated to Fort Sill, Oklahoma, where they were released in 1913.  AR003146.  Upon release, many of the Chiricahua Apache returned to New Mexico.  A smaller number remained in Fort Sill and organized as the Fort Sill Apache Tribe.  In August 1976, the Commissioner of Indian Affairs

approved the Fort Sill Apache constitution and bylaws, formally recognizing the Fort Sill

Apache Tribe.[2]   AR003146.

### 2.      The Akela Flats parcel

On April 2, 1999, the Department of the Interior took trust title for the benefit of the Fort

Sill Apache in a .53-acre parcel located in the lands of the former Kiowa, Comanche, and

Apache reservation.  ECF 80-5 at 2.  The Fort Sill Apache Tribe owned and operated a casino on

the parcel.  ECF 80-5 at 2.  In March 2005, the Comanche Nation of Oklahoma sued the

Department of the Interior challenging its approval of the transfer of the .53-acre parcel to the

Fort Sill Apache, because Interior did not seek Comanche approval prior to the transfer.  ECF

No. 80-5 at 2.  The three parties entered into a settlement agreement on January 9, 2007 to

resolve the litigation.  The .53-acre parcel is not directly at issue here.

Separately, in October 1998, the Tribe acquired approximately thirty acres of land in

Luna County, New Mexico, which is referred to as the "Akela Flats parcel."  AR000045.  On

June 26, 2002, the BIA approved the Tribe's application to take the Akela Flats parcel into trust.

AR003137.

On December 6, 2007, the Tribe issued a license for a gaming facility to be opened at

Akela Flats.  AR003138.  On February 27, 2008, NIGC issued a preliminary letter expressing its

opinion that gaming was not permitted on the Akela Flats property.  AR003139-40.  NIGC

continued analyzing the potential for gaming on the Akela Flats property in light of additional

information submitted by the Tribe.  AR003140-41.

---

[2] Much of the Chiricahua and Warm Springs Apache history is also recounted in various court
decisions.  *See, e.g.*, *Fort Sill Apache Tribe of State of Okl. v. United States*, 477 F.2d 1360, 1361
(Ct. Cl. 1973); *Fort Sill Apache Tribe v. United States*, 19 Ind. Cl. Comm. 212 (1968); *Scott v.
United States*, 33 Ct. Cl. 486, 494 (1898).  The brief synopsis provided here is not intended to
diminish or minimize the difficult historical context described in those opinions.  Rather, the
historical context is not directly relevant to the legal questions at issue under the APA at this
stage of the litigation.

### 3.     The May 2008 Opinion

On May 19, 2008, NIGC issued an opinion that the Akela Flats property was not suitable for gaming under IGRA because it did not qualify for an exception to the prohibition on gaming on trust lands acquired after 1988.  AR000044-72 (The May 2008 Opinion).  The May 2008 Opinion analyzed all three of the exceptions recognized in 25 U.S.C. § 2719(b)(1)(B): the last recognized reservation exception (AR000050-57), the restored lands exception (AR000058-70), and the initial reservation exception (AR000070-73).

### 4.     The April 2009 Opinion

In April 2009, the Tribe opened a gaming facility and began conducting gaming on the Akela Flats property.  AR003142.  On April 30, 2009, NIGC issued a supplement to the May 2008 Opinion, to analyze the effects of the settlement in the Comanche litigation on the Tribe's argument that its government-to-government relationship was terminated.  AR000036-37.  NIGC concluded that the Tribe had not identified any new evidence that would alter the conclusions in its May 2008 Opinion.  AR000043.

On July 21, 2009, the NIGC Chairman adopted the Office of General Counsel's May 2008 and April 2009 Opinions, and issued a Notice of Violation, NOV-09-35, to the Fort Sill Apache Tribe for gaming on the Akela Flats property.  AR003142.

### 5.     The May 2015 Decision and Order

After receiving the Notice of Violation, the Tribe waived its right to a hearing, electing to allow its appeal of the violation to proceed directly to the full NIGC Commission for a decision on the briefs.  AR003142.  The parties completed briefing in August 2011.  AR003145.  On May 5, 2015, the NIGC issued its final Decision and Order ("May 2015 Decision").  AR003134-167. The NIGC found that the Akela Flats property did not qualify for any of the exceptions to the general prohibition against gaming on newly acquired lands, and upheld the Notice of Violation. AR003158.

B.      **Statutory Background**

1.      **IGRA Exceptions to Prohibitions on Gaming**

Congress enacted IGRA, 25 U.S.C. §§ 2701 - 2721, in 1988 to provide a statutory basis

for the operation and regulation of Indian gaming, finding that existing federal law did not

"provide clear standards or regulations for the conduct of gaming on Indian lands."  25 U.S.C. §

2701(3).  "The congressionally declared purpose of the IGRA is to promote tribal economic

development and self-sufficiency in addition to shielding the tribes from the influences of

organized crime through the enactment of the statutory scheme regulating the operation of

gaming by Indian tribes."  *United States v. Cook*, 922 F.2d 1026, 1033 (2d Cir. 1991); *see also*

*Seminole Tribe of Fla. v. Florida*, 11 F.3d 1016, 1019 (11th Cir. 1994) ("In an attempt to supply

some much-needed regulation, and after contentious debate concerning the appropriate state role

in the regulation of Indian gaming, Congress enacted the [IGRA].").

Section 20 of IGRA ("Section 20") prohibits tribes from conducting gaming on trust

lands acquired after October 17, 1988, unless an exception applies.  *See* 25 U.S.C. § 2719(a)-(b).

In relevant part, Section 20 provides that IGRA's prohibition on gaming does not apply when

"lands are taken into trust as part of . . . (ii) the initial reservation of an Indian tribe

acknowledged by the Secretary under the Federal acknowledgment process, or (iii) the

restoration of lands for an Indian tribe that is restored to Federal recognition."  25 U.S.C. §

2719(b)(1)(B).[3]

---

[3] Section 20 provides additional exceptions that are not relevant for purposes of the Tribe's
motion for summary judgment.  For example, IGRA also exempts lands taken into trust as part of
settlement of a land claim.  25 U.S.C. § 2719(b)(1)(B)(i).  In addition, there is a procedure for
tribes to establish an exception by showing that gaming would not be detrimental to the
surrounding community and would be in the best interests of the tribe.  *See* 25 U.S.C. §
2719(b)(1)(A).  It also has specific statutory exemptions for certain tribes.  *See* 25 U.S.C. §
2719(b)(2-3).  None of these exceptions are implicated here.

Section 2719(b)(1)(B)(ii) is referred to as the "initial reservation exception."  This exception applies to lands that comprise the initial reservation of a tribe that has been acknowledged "*by the Secretary under the Federal acknowledgment process.*"  25 U.S.C. § 2719(b)(1)(B)(ii) (emphasis added).  The plain language of the statute refers to "the federal acknowledgment process"—a specific, single federal acknowledgment process.  Courts have recognized that "[a]cknowledgment is a specifically defined term under the IGRA, because the statute expressly references a federal administrative process, 25 C.F.R. Part 83, by which the agency acknowledges the historical existence of a tribe."  *TOMAC v. Norton*, 193 F. Supp. 2d 182, 194 n.8 (D.D.C. 2002), *aff'd sub nom. TOMAC, Taxpayers of Mich. Against Casinos v. Norton*, 433 F.3d 852 (D.C. Cir. 2006) (quoting *Grand Traverse Band of Ottawa and Chippewa Indians v. U.S. Atty. for W. Dist. of Mich.,* 46 F. Supp. 2d 689, 699 (W.D. Mich. 1999)); *see also Mackinac Tribe v. Jewell*, 829 F.3d 754, 756 (D.C. Cir. 2016) ("Finally, in 1978, Interior promulgated Part 83 of its regulations under the IRA (also known as the Federal Acknowledgment Process), which set out uniform procedures through which Indian groups could seek formal recognition.").

Section 2719(b)(1)(B)(iii), by contrast, is referred to as the "restored lands" exception.  It provides that the IGRA's general prohibition on gaming does not apply when "lands are taken into trust as part of . . . the restoration of lands for an Indian tribe that is restored to Federal recognition."  25 U.S.C. § 2719(b)(1)(B)(iii).  To qualify for this exception, a tribe must show that: (1) it was at one time federally recognized; (2) that it lost its government to government relationship; (3) that it was restored to federal recognition; and (4) that the land on which it wants to game was taken into trust as part of the restoration of lands for the restored tribe. *Grand Traverse Band of Ottawa & Chippewa Indians v. Office of U.S. Atty. for W. Div. of Mich.*, 369 F.3d 960, 967 (6th Cir. 2004); 25 C.F.R. § 292.7.

IGRA established the National Indian Gaming Commission ("NIGC"), 25 U.S.C. §

2704(a), and set forth the NIGC's powers and responsibilities.  The statute also vested the

Secretary of the Interior ("Secretary") with certain authorities and responsibilities.  Both the

Secretary, at 25 C.F.R. parts 290-93, and the NIGC, at 25 C.F.R. parts 500-585, have

promulgated regulations under IGRA.

**2.    25 C.F.R. Part 83 Regulations governing federal acknowledgment**

Apart from IGRA regulations, the Secretary has promulgated regulations in 25 C.F.R.

Part 83 governing federal acknowledgement of Indian tribes.  "[H]istorically[,] the United States

recognized tribes through treaties, executive orders, and acts of Congress," and, "even after the

passage of the [Indian Reorganization Act or "IRA"]" in 1934, "[r]ecognition by the federal

government proceeded in an ad hoc manner, . . . with the [BIA] reviewing petitions for federal

recognition on a case-by-case basis."  *Stand Up for California! v. U.S. Dep't of the Interior*, 204

F. Supp. 3d 212, 297 (D.D.C. 2016), *aff'd sub nom. Stand Up for California! v. United States

Dep't of Interior*, 879 F.3d 1177 (D.C. Cir. 2018) (citing *Mackinac Tribe*, 829 F.3d at 755).  In

1978, Interior promulgated regulations "to establish a departmental procedure and policy for

acknowledging that certain American Indian tribes exist."  43 Fed. Reg. 39,361, 39,362 (Aug.

24, 1978).[4]  "'Such acknowledgment of tribal existence ... is a prerequisite to the protection,

services, and benefits from the Federal Government available to Indian tribes,' including the

benefits of the IRA."  *Cty. of Amador v. U.S. Dep't of the Interior*, 872 F.3d 1012, 1017 (9th Cir.

2017), *cert. denied sub nom. Cty. of Amador, Cal. v. Dep't of Interior*, 139 S. Ct. 64, 202 L. Ed.

---

[4] The Part 83 regulations were originally codified at 25 C.F.R. Part 54.  43 Fed. Reg. 39,361.
"They were later redesignated without change as 25 C.F.R. Part 83."  Procedures for Establishing
That an American Indian Group Exists as an Indian Tribe, 59 Fed. Reg. 9280.  They were
amended and revised in 1994 (59 Fed. Reg. 9280 (Feb. 25. 1994)) and again in 2015 (80 Fed.
Reg. 37862 (July 1, 2015)).  The references in this section are to the pre-1994 version of the part
83 regulations because that was the language that was at issue at the time FSA was recognized.

2d 21 (2018) (quoting 43 Fed. Reg. 39,361, 39,362 (Aug. 24, 1978)).  "Prior to 1978, Federal

acknowledgment was accomplished both by Congressional action and by various forms of

administrative decision. . . .The [Part 83] regulations established the first detailed, systematic

process for review of petitions from groups seeking Federal acknowledgment."  Procedures for

Establishing That an American Indian Group Exists as an Indian Tribe, 59 Fed. Reg. 9280 (Feb.

25, 1994).

　　　　At the time that FSA was recognized, Part 83 applied to "American Indian groups

indigenous to the continental United States which are ethnically and culturally identifiable, but

which are not currently acknowledged as Indian tribes by the Department."  25 C.F.R. § 83.3(a)

(1993).  An Indian group had to submit a documented petition explaining how it meets the seven

criteria for federal acknowledgment. *Id.* § 83.7 (1993).  Among other criteria, the petitioner had

to show that it had been identified as an American Indian or aboriginal on a substantially

continuous basis from historical times to the present; that "its members are descendants of an

Indian tribe which historically inhabited a specific area "; that it has "maintained tribal political

influence or other authority over its members as an autonomous entity throughout history until

the present."  25 C.F.R. § 83.7(a)-(c), (e) (1994); *see also Muwekma Ohlone Tribe v. Salazar*,

708 F.3d 209, 218 (D.D.C. 2013).  At that time, part 83 applied not only to groups seeking

recognition in the first instance, but also to then unrecognized groups that had been recognized as

Indian tribes in the past, such as through treaties or executive orders.  *Id*. § 83.8 (1993); *see also*

*Muwekma Ohlone Tribe v. Salazar*, 708 F.3d 209, 218 (D.D.C. 2013) ("[T]he Part 83 process

applies to a petition of a previously recognized tribe that seeks current recognition on that

basis.").  Once acknowledged (whether by Part 83 or by other means of acknowledgement), the

group is added to the list of federally recognized Indian tribes, which Interior regularly publishes

in the Federal Register.  *See id*. § 83.5(a) (1993).

### 3.     25 C.F.R. Part 292 Regulations implementing IGRA

"In 2008, DOI promulgated regulations, at 25 C.F.R. § 292, to 'implement [Section 20]

of IGRA by articulating standards that the Department will follow in interpreting the various

exceptions' to IGRA's general prohibition on gaming on after-acquired lands."  *Koi Nation of N.*

*Cal. v. U.S. Dep't of Interior*, 361 F. Supp. 3d 14, 22–23 (D.D.C. 2019) (quoting Final Rule,

Gaming on Trust Lands Acquired After October 17, 1988, 73 Fed. Reg. 29354, 29354 (May 20,

2008)); *see also* 25 C.F.R. § 292.1 ("This part contains procedures that the Department of the

Interior will use to determine whether [IGRA's Section 20] exceptions apply."); 25 C.F.R. §§

292.3–292.12 (providing DOI's procedures for implementing IGRA Section 20 exceptions).

The criteria for establishing the initial reservation exception are provided in 25 C.F.R. §

292.6 as follows:

> (a) The tribe has been acknowledged (federally recognized) through the
> administrative process under part 83 of this chapter.
>
> (b) The tribe has no gaming facility on newly acquired lands under the restored
> land exception of these regulations.
>
> (c) The land has been proclaimed to be a reservation under 25 U.S.C. § 467 and is
> the first proclaimed reservation of the tribe following acknowledgment.
>
> (d) If a tribe does not have a proclaimed reservation on the effective date of these
> regulations, to be proclaimed an initial reservation under this exception, the tribe
> must demonstrate the land is located within the State or States where the Indian
> tribe is now located, as evidenced by the tribe's governmental presence and tribal
> population, and within an area where the tribe has significant historical
> connections and one or more of the following modern connections to the land:
>
>> (1) The land is near where a significant number of tribal members reside;
>> or (2) The land is within a 25–mile radius of the tribe's headquarters or other
>> tribal governmental facilities that have existed at that location for at least 2 years
>> at the time of the application for land-into-trust; or (3) The tribe can demonstrate
>> other factors that establish the tribe's current connection to the land.

25 C.F.R. § 292.6

Notably, when Interior promulgated the Part 292 regulations, it received comments suggesting that § 292.6(a) inappropriately restricts the scope of the "Federal acknowledgment process" to the regulatory procedures in 25 C.F.R. Part 83.  Gaming on Trust Lands Acquired After October 17, 1988, 73 Fed. Reg. 29354 (May 20, 2008).  In response, Interior noted that "[t]he Department does not accept the recommendation to apply these regulations more broadly to recognition by means other than that through 25 C.F.R. Part 83. The plain meaning of the statute suggests that it applies to tribes acknowledged by this process and no others."  *Id*. at 29,360.

25 C.F.R. § 292.7 sets forth "[w]hat must be demonstrated to meet the 'restored lands' exception" as follows:

> Gaming may occur on newly acquired lands under this exception only when all of the following conditions in this section are met:
>
> (a) The tribe at one time was federally recognized, as evidenced by its meeting the criteria in § 292.8;
>
> (b) The tribe at some later time lost its government-to-government relationship by one of the means specified in § 292.9;
>
> (c) At a time after the tribe lost its government-to-government relationship, the tribe was restored to Federal recognition by one of the means specified in § 292.10; and
>
> (d) The newly acquired lands meet the criteria of "restored lands" in § 292.11.

*Id*.  Section 292.12 further requires a tribe to establish modern, historical, and temporal connections to specific newly-acquired lands in order to qualify for the restored lands exception. 25 C.F.R. § 292.12.

## III.   STANDARD OF REVIEW

Because IGRA does not provide a private right of action, judicial review of an IGRA claim is governed by the APA, 5 U.S.C. §§ 701-06.  *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882 (1990); *Or. Nat. Res. Council v. Lowe*, 109 F.3d 521, 526 (9th Cir. 1997).  The APA

imposes a narrow and highly deferential standard of review limited to a determination of whether

the federal agencies acted in a manner that was "arbitrary, capricious, an abuse of discretion or

otherwise not in accordance with law."  5 U.S.C. § 706(2)(A); *Marsh v. Or. Nat. Res. Council*,

490 U.S. 360, 378 (1989).

A court is only to assess whether the agency's decision is "within the bounds of reasoned

decisionmaking." *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87, 105 (1983). "The

agency . . . is required to 'examine the relevant data and articulate a satisfactory explanation for

its action including a rational connection between the facts found and the choices made,' and

[courts] in turn must review that explanation, considering 'whether the decision was based on a

consideration of the relevant factors and whether there has been a clear error of judgment."

*Providence Yakima Med. Ctr. v. Sebelius*, 611 F.3d 1181, 1190 (9th Cir. 2010) (quoting *Motor*

*Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).  A reviewing

court may not substitute its own judgment for that of the agency.  *Id*.

## IV.    ARGUMENT

### A.    NIGC Properly Concluded That FSA Does Not Qualify For IGRA's Initial Reservation Exception.

FSA argues that the Tribe qualifies for the initial reservation exception because it was

recognized in August 1976 and was published in the initial list of federally recognized tribes in

1979.  Pl's. Mot. at 39-40.  The Tribe also infers "apparent conflicting views" between Interior

and NIGC that somehow undermines the NIGC's conclusion that the Tribe does not qualify for

the initial reservation exception.  *Id.* at 40-41.  In both instances, the Tribe is simply seeking to

replace NIGC's judgment and assessment of the evidence with its own analysis.  Under, the APA

however, the Court's role is to review the agency's reasoning, not substitute its (or a plaintiff's)

judgment for that of the agency.  *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416

(1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99, 97 (1977); *Tex. Neighborhood Servs. v. U.S. Dep't of Health & Human Servs.*, 875 F.3d 1, 5 (D.C. Cir. 2017).

In any event, FSA is wrong on both counts.  NIGC's well-reasoned decision makes clear that to qualify for the initial reservation exception, the Tribe must be acknowledged pursuant to the federal acknowledgement process in 25 C.F.R. part 83.  The Tribe concedes that it was not so recognized.  In addition, the Tribe's suspicions regarding privileged communications between Interior and NIGC are irrelevant to the Court's inquiry, and cannot support FSA's burden to show that NIGC's decision was arbitrary and capricious.

> **1.    FSA cannot qualify for the Initial Reservation Exception because the Tribe was not recognized through a Federal Acknowledgement Process as required by statute.**

In order to qualify for the initial reservation exception, FSA had to show that the Akela Flats parcel was part of the tribe's reservation; that it was the tribe's initial reservation; and that the tribe was recognized by the Secretary through the federal acknowledgement process set out in 25 C.F.R. Part 83.  AR000070; *see also* 25 U.S.C. § 2719(b)(1)(B)(ii); 25 C.F.R. § 292.6. Here, IGRA's initial reservation exception does not apply to FSA because the Tribe was not recognized through the federal acknowledgement process as required by IGRA.[5]

NIGC's May 2008 Opinion explains that "[a]cknowledgment is a specifically defined term under the IGRA, because the statute expressly references a federal administrative process, 25 C.F.R. part 83, by which the agency acknowledges the historical existence of a tribe." AR000072 (quoting *Grand Traverse Band of Ottawa and Chippewa Indians v. United States*

---

[5] In its May 2008 Opinion, NIGC also concluded that the Tribe had not shown that Akela Flats was a reservation nor that it was the initial reservation.  AR000070-72.  By the time of the May 2015 Decision, however, the Secretary of the Interior had proclaimed Akela Flats as reservation land for the Tribe.  AR003162.  This proclamation mooted the dispute with regard to the first two prongs of the initial reservation exception.  *Id.*  The lone remaining dispute centers on whether the Tribe can meet the third element of the initial reservation exception – namely, whether the Tribe was acknowledged through a federal acknowledgment process.  *Id.*

*Attorney for the Western District of Mich.*, 46 F. Supp. 2d 689, 699 (W.D. Mich. 1999)); *see also TOMAC v. Norton*, 193 F. Supp. 2d at 194 n.8.  Indeed, NIGC pointed out in its analysis that "'federal acknowledgement process' is a term of art that is commonly understood to refer to the regulations adopted by the Secretary in Part 83. . . ."  AR00072.  To rebut the Tribe's claim that it was recognized in 1976 before the part 83 regulations were promulgated, NIGC correctly noted that "the recognition of tribes prior to the development and implementation of the BIA's federal acknowledgment regulations cannot be fairly identified as a process."  AR000072.  NIGC recognized that it was the lack of a process and the case-by-case discretionary nature of the pre-regulation recognition protocol that gave rise to the need for a clear and standardized process.  AR000072-73.  NIGC adopted the May 2008 Opinion's rationale in its May 2015 Decision.  AR 003162 ("The May 2008 Opinion considered and rejected this argument, and we find nothing in the record on appeal that would compel us to overrule that determination.").  In its January 2017 letter, the NIGC determined that there are no grounds, for settlement purposes, for reconsideration of the Commission's May 2015 Decision.  ECF No. 67-1.

The Tribe attempts to undermine NIGC's conclusion by arguing that IGRA's initial reservation exception is ambiguous.  FSA acknowledges that the Tribe was recognized in August 1976 (Pl's. Mot. at 40), nearly two years before the part 83 acknowledgement process was promulgated.  The Tribe argues that IGRA's reference to "the Federal acknowledgement process" is ambiguous, but does not provide any citation to authority.[6]

As discussed above, the plain language of IGRA is clear that the initial reservation exception contemplates acknowledgment by the Secretary pursuant to "*the* Federal

---

[6] Even if the statute were ambiguous, NIGC's interpretation would be entitled to deference. *Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 920 F.3d 1, 32 (D.C. Cir. 2019) ("If a statute is ambiguous, and if the implementing agency's construction is reasonable, *Chevron* requires a federal court to accept the agency's construction of the statute, even if the agency's reading differs from what the court believes is the best statutory interpretation.").

acknowledgement process."  25 U.S.C. § 2719(b)(1)(B)(ii) (emphasis added); *see also Bd. of Cty. Comm'r of Kay Cty. v. Fed. Hous. Fin. Agency*, 754 F.3d 1025, 1029 (D.D.C. 2014) (stating "When a statute's language is plain, [the Court] 'must enforce it according to its terms.'" (citation omitted)).  The use of the singular definite article "the" makes clear that IGRA contemplates a specific singular acknowledgment process—not one of the many ad-hoc methods by which tribes had been recognized historically.  *See Nielsen v. Preap*, 139 S. Ct. 954, 965, 203 L. Ed. 2d 333 (2019) ("Here grammar and usage establish that "the" is "a function word . . . indicat[ing] that a following noun or noun equivalent is definite or has been previously specified by context." Merriam-Webster's Collegiate Dictionary 1294 (11th ed. 2005).").  If Congress had intended to refer to any of multiple federal processes, it would have used the indefinite "a" or "any" to refer to any of several Federal acknowledgement processes that might satisfy the statute.  In 1988, however, when IGRA was passed, 25 C.F.R. part 83 had been considered *the* Federal acknowledgement process since its adoption a decade earlier in 1978.  Interior expressly recognized this fact when it passed the Part 292 regulations in 2008.  In response to public comments on the proposed rule, Interior noted that the "Federal acknowledgement process" in the initial reservation exception was limited to the process outlined in 25 C.F.R. part 83.  73 Fed. Reg. 29354.

Finally, another Court in this Circuit has also recently interpreted the plain language of 25 U.S.C. § 2719(b)(1)(B)(ii) in the same manner.  In *Koi Nation of Northern California v. U.S. Department of the Interior*, the court explained that IGRA's initial reservation exception referred specifically to "tribes that achieved recognition through the 'Federal acknowledgment process.'" 361 F. Supp. 3d 14, 47 (D.D.C. 2019).  It recognized that, for purposes of the initial reservation exception, "Federal acknowledgement process" referred to the Part 83 process.  *See id.*  The court contrasted the language in IGRA's initial reservation exception with the language in

IGRA's restored lands exception, which does not similarly reference the Federal acknowledgement process to limit the ways in which a tribe's status could be considered restored under the statute.  *Id.* (holding that 25 C.F.R. § 292.10(b)'s limitation on restored tribes to those restored under Part 83 was not supported by the plain language of IGRA).

In short, NIGC's conclusion that the Akela Flats parcel does not qualify for IGRA's initial reservation exception was reasonable and well-supported in the law because the Tribe was not recognized pursuant to the Federal acknowledgement process in 25 C.F.R. part 83 as required by the plain language of the statute.  FSAs' motion for summary judgment on that issue should therefore be denied.

>2.     **FSA's suggestion of a "disagreement" between Interior and NIGC is irrelevant and cannot satisfy the Tribe's burden under the APA.**

FSA also raises what it describes as "apparent conflicting views" between Interior and NIGC, which the Tribe alleges is reflected in NIGC's January 2017 letter explaining that it would not be revisiting the conclusions of its May 2015 decision.  Pl's. Mot. at 40.  FSA's entire argument is premised on supposition and assumption about the contents of a privileged communication for settlement purposes between Interior and NIGC.  The Court's review is limited to the administrative record, and this Court has already held that the December 2016 letter is privileged and is not part of the administrative record.  *See Fort Sill Apache Tribe v. Nat'l Indian Gaming Comm'n*, 345 F. Supp. 3d 1, 8 (D.D.C. 2018) ("The motion to complete the record with the Solicitor's Letter will be denied."); *see also EarthReports, Inc. v. Fed. Energy Regulatory Comm'n*, 828 F.3d 949, 959 (D.C. Cir. 2016) ("court's review is limited to the administrative record before the agency at the time of its decision").  The Tribe's conjecture regarding the content of privileged communications therefore cannot lend any support to its arguments under the APA.  The Tribe has therefore failed to carry its burden to show that the

NIGC's May 2015 Decision was arbitrary and capricious based on assumptions regarding the December 2016 letter.

> **B.    NIGC Properly Determined That FSA Is Not A Restored Tribe And Akela Flats Is Not Restored Land For Purposes of IGRA.**

After many years of administrative proceedings and numerous submissions of briefing and evidence by FSA, the NIGC concluded in May 2015 that the Akela Flats parcel did not qualify for IGRA's restored lands exception.  AR003159-3161.  To qualify for the exception, the Tribe must show the following:

1)   That it was at one time federally recognized;

2)   That it lost its government-to-government relationship;

3)   That it was restored to federal recognition; and

4)   That the land on which wants to game was taken into trust as part of the restoration of lands for the restored tribe.

25 U.S.C. § 2719(b)(1)(B)(iii); 25 C.F.R. § 292.7; *see also see also Grand Traverse Band*, 369 F.3d at  967.

Here, there was no dispute that the Tribe was historically federally recognized. AR000058-60 (noting that the "Fort Sill Apache descend from the Chiricahua and Warm Springs Apache Bands and claims its ancestors' federal recognition for its own.").  NIGC also noted that "the Fort Sill Apache Tribe is the same tribe and can claim the political history of its ancestors as its own."  AR000059   There is also no dispute that the Fort Sill Apache organized under the Indian Reorganization Act by submitting a constitution to the Secretary of the Interior for approval.  AR000060.  Interior approved the Fort Sill Apache constitution on August 16, 1976. *Id.*  NIGC reasonably concluded (with record support), however, that the Tribe did not present evidence demonstrating that the Tribe had been terminated for purposes of the restored lands exception.  AR003160; AR000059-61; AR000039-42.  NIGC also properly determined that the

Akela Flats parcel had not been taken into trust as part of any restoration.  AR000061-70;
AR003160.

In challenging NIGC's conclusions, the Tribe does not appear to directly contest NIGC's
analysis of the restored lands exception.  Rather, FSA relies almost entirely on NIGC's approval
of a gaming ordinance for the Karuk Tribe of California to argue that the NIGC treated the Fort
Sill Apache differently than the Karuk Tribe.  Pl's. Mot. at 26-30; 42-44.  FSA's argument fails,
however, because there are numerous factual differences between the Karuk Tribe's invocation
of the restored lands exception and that of the Fort Sill Apache.  *Compare* SUPP-AR-000081-93
*with* AR00058-70; AR000036-43.  Moreover, as discussed in more detail below, the NIGC's
analysis and conclusions regarding the applicability of the restored lands exception were well-
reasoned and should be upheld.

### 1.     FSA presented no evidence of termination of its recognition.

NIGC reasonably concluded that the Tribe does not qualify for IGRA's restored lands
exception because it failed to provide sufficient evidence that its federal recognition was actually
terminated.  The federal government formally recognized the southwestern Apache tribes in the
July 1, 1852 Treaty, which was signed by the chief of the Chiricahua Apaches.  AR000059; *see
also Fort Sill Apache*, 19 Ind. Cl. Comm. at 224.  When the United States tried to remove the
Apache to a reservation at San Carlos, Geronimo and a small group of Apaches began hostilities
against the United States.  AR000059-60; *Fort Sill Apache*, 19 Ind. Cl. Comm. at 244.  In
September 1886, the last remaining Apaches surrendered and were transferred to prison camps in
Florida.  AR000060; *see also Fort Sill Apache Tribe of State of Okl. v. United States*, 477 F.2d
1360, 1361 (Ct. Cl. 1973) ("The surrender in Mexico, September 4, 1886, of Geronimo, Natchez,
and other Apaches classified as hostile, represented the end of the forays by the Chiricahuas.").
"In October 1894, the 259 remaining Chiricahuas were again moved; this time to the Fort Sill

Military Reservation in Oklahoma," where they remained as prisoners of war until they were released in April 1913.  *Fort Sill Apache Tribe of State of Okl*, 477 F.2d at 1361.  Many tribal members returned to the Mescalero Reservation in New Mexico while some remained at the Fort Sill reservation in Oklahoma.  *Id*. at 1362.

NIGC recognized, however, that none of the actions by the federal government constituted a termination of the government-to-government relationship.  AR000060; AR000040-41.  Indeed, the fact that Apaches engaged in hostilities were taken as prisoners of war indicates that the Tribe was considered a sovereign entity (albeit one engaged in hostilities against the United States).  *Id*.[7]  The Tribe did not provide any evidence that tribal recognition of the Chiricahua or Warm Springs bands (from whom the Fort Sill derived their recognition) was ever terminated.  AR000060; AR000040-41.  The basis of the Tribe's contention appears to be that the imprisonment of Apache as prisoners of war (even those who may have served as scouts for the United States) amounted to a *de facto* termination of government recognition.  *See* AR003160.[8]

---

[7] Notably, the Court of Claims concluded that the hostilities engaged in by Geronimo and his band of Apaches were not considered depredations by the Tribe, but rather were the actions of Geronimo and approximately 22 individuals who had escaped and broken from the Tribe to conduct hostilities against the United States.  *Scott v. United States*, 33 Ct. Cl. 486, 494 (1898) ("But in this case of Geronimo's band, only 22 men broke away from the band of prisoners in May, 1886, some of whom subsequently returned to the reservation, though a few from the reservation subsequently joined Geronimo; their wives and children did not accompany them; they had no previous formation as a band; their leader was not a chief; as has been said, they were but the minority of a minority, insignificant in numbers, without home or habitat, claiming nothing but their intrinsic ability to wage war against the United States.").  Accordingly, the United States could have maintained a government to government relationship with the Tribe despite the ongoing hostilities with Geronimo and his men.

[8] In its May 2015 Decision, the NIGC noted that even if the actions of the United States amounted to a de facto termination of government recognition, it would not have changed the overall conclusion because the land still does not meet the restored lands exception.  AR003160.  The restored lands prong is discussed in more detail in Section IV.B.2, below.

While NIGC acknowledged that the historical facts surrounding the relocation and imprisonment of the Apache tribes reflects a "sorrowful time" during which the Tribe was unable to exercise the full rights of a sovereign government, it nonetheless did not satisfy IGRA's requirement for demonstrating an actual termination of the government to government relationship.   AR003160.  The administrative record fully supports this conclusion.  For example, when the Tribe was settled on the Fort Sill Military Reserve in 1894, Congress thereafter appropriated funds for the "maintenance and support" of the Tribe.  AR000437-38.  In 1897, President Cleveland signed an executive order establishing a portion of the Fort Sill Military Reserve as a "permanent location" for the Tribe. AR 000441.  In 1901, additional lands were added to the Fort Still Military Reserve "for the use and benefit" of the Tribe.  *Id.*  Also in 1901, Congress appropriated funds to construct buildings, purchase livestock, tools, and other articles "needed for the support and maintenance of the Apache prisoners of war permanently established at Fort Sill . . . ." AR 000442.

In addition, some of the supplemental administrative record material submitted by the Tribe indicates that the relationship was not terminated.  For example, in December 1975, the Tribe sent a memo to members stating that "The Fort sill Apache Tribe of Oklahoma has entered into a contract with the government for the purpose of providing means by which the Tribe can strengthen tribal government functions . . . ."  SUPP-AR-000009.  In March 1976, it appears the Anadarko Agency issued a payment of $1,174.67 to the "Fort Sill Apache Tribe in accordance with provisions of above referenced contract."  SUPP-AR-000014.  If there truly had been no government-to-government relationship recognized, it seems unlikely that the Anadarko Agency would have been entering contracts and paying money to the Tribe months before FSA claims the Tribe was recognized in August 1976.

In short, the Tribe "failed to provide evidence of consistent historical written documentation from the federal government effectively stating that it no longer recognized the government-to-government relationship with the Chiricahua and Warm Springs Apache tribes or its members or taking action to end the government-to-government relationship."  AR000043.  FSA has not pointed to any additional evidence in the record that calls into question NIGC's reasoned conclusion that the Tribe failed to establish that it had been terminated for purposes of IGRA's restored lands exception.

> ## 2. The Akela Flats parcel was not taken into trust as part of any restoration.

To establish the fourth prong of the restored lands exception, the Tribe must show that the Akela Flats land was taken into trust as part of the restoration.  AR003160.  NIGC identified the three factors to determine whether the land qualified for the exception: 1) the factual circumstances of the acquisition; 2) the location of the acquisition; and 3) the temporal relationship of the acquisition to the tribal restoration.  AR003160.  NIGC extensively analyzed three factors in its May 2008 Opinion.  AR000062-70.  On the factual circumstances of the acquisition, NIGC found that the Tribe had purchased seven parcels totaling over eighty-two acres of land in Oklahoma before it purchased the Akela Flats property in New Mexico.  AR00064-65.  This indicated that the Akela Flats parcel was not part of the Tribe's initial attempts to build its land base after restoration.  With regard to the location of the acquisition, NIGC found that the Tribe had established a historical connection to the land because it was in lands historically occupied by the Tribe, and it appears to have been part of their aboriginal territory.  AR000067-68.  However, in evaluating the Tribe's modern connection to the land, NIGC determined that the Tribe did not show any modern connection to the land from the time the Chiricahua were removed in 1886 until the purchase of Akela Flats in 1998.  AR000068.  In addition, Akela Flats is located over 540 miles from the nearest FSA governmental offices.

AR000069.  And no tribal members lived on the Akela Flats property or adjacent to it.  *Id.*

Accordingly, NIGC concluded that the Tribe had failed to establish evidence of modern

connections to the land.  AR000070.  Finally, NIGC found that the Tribe waited nearly twenty-

three years from the time it was recognized in 1976 until it purchased the Akela Flats parcel in

1998.  AR000062-64.  Although the lapse of twenty-three years may not have been

determinative in and of itself, the lack of evidence establishing the other factors caused NIGC to

conclude that FSA had failed to show that the Akela Flats parcel satisfied the restored lands

exception.  AR000063.

In May 2015, NIGC reviewed the analysis in the May 2008 Opinion (AR000062-70) and

the April 2009 Opinion (AR000036-43), as well as additional material provided by the Tribe,

ultimately concurring in the May 2008 Opinion's conclusions.  AR003160.  In January 2017,

NIGC reiterated that it did not see any grounds for settlement purposes to reconsider the May

2015 Decision.  ECF No. 67-1.  All of those conclusions were fully supported by the

administrative record and complied with the APA.  The Tribe's motion for summary judgment

on this claims should also be denied.

### 3. NIGC's Karuk Tribe opinion is inapposite because the Karuk Tribe presented extensive evidence of termination.

FSA relies heavily on the NIGC's April 2012 Memo approving the Karuk Tribe of

California's gaming ordinance, to establish that Fort Sill was similarly situated but treated much

differently.  Pl's. Mot. at 26-30.  Despite the Tribe's allegation that the record in Karuk was

"very similar" to that of FSA, it is clear that there were many material differences between the

two tribes' situations.  *Compare* SUPP-AR-000081-93 *with* AR00058-70; AR000036-43.

First, unlike FSA, Karuk presented extensive, direct evidence that Interior had treated the

Karuk Tribe as terminated.  SUPP-AR-000085.  For example, "BIA denied services to Karuk

based on a determination that they were not federally recognized . . . ."  *Id.*  In addition, when the

Karuk Tribe approached the BIA in an attempt to organize under the Indian Reorganization Act, "the BIA informed the Tribe that it was 'not a Federally recognized Indian entity' and could not organize under the IRA." *Id*.  By contrast, when the Fort Sill Apache approached BIA to organize, they simply submitted their constitution and bylaws, which were subsequently approved.  AR003146.  Similarly, as discussed in note 6, above, when the Fort Sill Apache sought to enter into a contract to improve its governance, BIA processed the paperwork, and appears to have paid money to Fort Sill before the Tribe had even had its constitution and bylaws approved.  SUPP-AR-000014.  Indeed, at almost the same time the Fort Sill Apache Tribe was signing its Tribal Government Development Program documents, the Karuk Tribe was being told that it could not organize under the IRA, and it was denied a BIA contract for lack of federal recognition.  *Compare* SUPP-AR-000014 *with* SUPP-AR-000086 (describing Karuk Tribe's evidence of termination).

Second, unlike FSA, the Karuk Tribe presented much more compelling evidence to demonstrate that its lands were actually restored lands for purposes of IGRA.  SUPP-AR-000089-93.  The Karuk Tribe was able to show that although it purchased a number of parcels before it purchased the Yreka parcel, it did so to address a need to establish housing for its tribal members.  SUPP-AR-0000990.  So, although it was not among the first parcels to be acquired, Karuk Tribe presented evidence to show that it was part of an overall restoration scheme.  *Id*.  Also, unlike FSA, the Karuk Tribe was able to show that the Yreka parcel was only 38 miles from its tribal headquarters.  SUPP-AR-000091; *contrast* AR00069 (showing that the Akela Flats property was over 540 miles from the nearest Fort Sill Apache governmental office). The Karuk Tribe was able to demonstrate both a historical and modern connection to the Yreka

parcel, which NIGC found persuasive in approving the Karuk Tribe's ordinance.  SUPP-AR-000092.[9]

FSA's reliance on the Karuk Tribe opinion is therefore misplaced.  There are very clear critical differences between the Karuk Tribe's history of termination and recognition and that of the Fort Sill Apache.  The Karuk Tribe's opinion is therefore inapposite and does not call into question NIGC's conclusion that FSA cannot meet the restored lands exception.

## V.    CONCLUSION

NIGC reasonably concluded that the Notice of Violation should be upheld.  The administrative record in this case fully supports NIGC's determination that neither the initial reservation exception nor the restored lands exceptions applies to the Akela Flats parcel.  FSA was not recognized through the Federal acknowledgment process under the 25 C.F.R. Part 83, which is a prerequisite to the initial reservation exception.  FSA failed to establish that its government to government relationship with the United States had ever been terminated, and failed to show that the Akela Flats parcel was acquired as part of the Tribe's restoration.  NIGC's decision upholding the Notice of Violation was well-reasoned and fully supported in the administrative record.  Accordingly, the Court should enter judgment in favor of Federal Defendants on all of the Tribe's claims.

---

[9] NIGC found that the twenty-two year gap between recognition and the time Karuk Tribe acquired the Yreka parcel weighed against finding that the tribe satisfied the restored lands exception.  SUPP-AR-000092.  However, much like it did with FSA, NIGC noted that if the Karuk Tribe had not established the other prongs, it might have found the twenty-two year gap to bar application of the restored lands exception.  SUPP-AR-000092.  This just highlights how big the differences were between the Karuk Tribe's and Fort Sill's respective situations.

Respectfully submitted,

LAWRENCE VANDYKE
Assistant Attorney General

BY:                                   *Brian Collins*
                                        Senior Trial Attorney
                                        Natural Resources Section
                                        Environment and Natural Resources Division
                                        United States Department of Justice
                                        P.O. Box 7611
                                        Washington, D.C.  20044-7611
                                        Email: brian.m.collins@usdoj.gov
                                        Ph:  (202) 305-0428
                                        Fx: (202) 305-0506

                                        *Attorney for Federal Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 19th day of July, 2019, the foregoing Cross-Motion for Summary Judgment and Response to Plaintiff's Motion for Summary Judgment was filed with the Court's CM/ECF system, which will send notification to counsel of record in this matter who are registered with the Court's CM/ECF system.

*/s/ Brian Collins*

Brian Collins
