## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

FORT SILL APACHE TRIBE    )
                                 )
         **Plaintiff,**      )
                                 )
**v.**                           )     **Civil Action No. 14–0958 (RMC)**
                                 )
**NATIONAL INDIAN GAMING**  )
**COMMISSION, et al.,**      )
                               )
        **Defendants.**    )
_____)

### PLAINTIFF'S RESPONSE TO DEFENDANTS' CROSS MOTION
### FOR SUMMARY JUDGMENT, AND REPLY TO DEFENDANT'S
### RESPONSE TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

## I.  INTRODUCTION

Defendants have hewn to intractable positions for a more than a decade: The "initial "reservation" exception[1] to IGRA's general prohibition against gaming on "after acquired lands" is available only to Tribes acknowledged as federally recognized under the "federal acknowledgment process" set out by 25 C.F.R. Part 83 ("Part 83"); and the 27 year internment of every man, woman and child of the Chiricahua Apache taken from the Southwest as prisoners of war did nothing to end the prisoners' "government to government" relationship with the United States, thereby rendering descendants and their survivors – who years later managed to organize as the Fort Sill Apache Tribe of Oklahoma – ineligible for the "restoration of lands for an Indian tribe ... restored to Federal recognition" exception to IGRA's prohibition against gaming on lands acquired after the date of its passage, October 17, 1988.  25 U.S.C. § 2719(b)(1)(B)(ii).

_____

[1]25 U.S.C. § 2719(b)(1)(B)(ii)) ("the initial reservation of an Indian tribe acknowledged by the Secretary under the Federal acknowledgment process ...").

Defendants have finally attempted to explain the basis for finding the Karuk Tribe of California eligible for the "restoration of lands" exception as a "restored tribe", where the NIGC deemed a finding of "*de facto* termination" a sufficient predicate to establish the restored tribe element of the exception; and held that the termination of the Karuk's government to government relationship with the United States derived from a lengthy period when the parties did not keep up their correspondence, during which the United States mistakenly came to regard the Karuk as unrecognized. (AR003124-3126).

Yet the Karuk people  plainly survived as a distinct Tribal entity, and acquired lands the NIGC held to constitute the requisite "restoration of lands" element of the exception some 23 years after the governmental parties got back in touch.

For 27 years the Chiricahua taken as prisoners of war after Geronimo's final surrender in September 1884 were anything but free, as their numbers declined dramatically as a result of illness and disease unknown in their aboriginal homelands of the Southwest.  The Chiricahua did not survive the 27 imprisonment as a distinct Tribal entity and people.  Their descendants managed to organize as the Fort Sill Apache Tribe of Oklahoma some 63 years after the imprisonment ended, and to acquire the 30 acre parcel within their aboriginal homeland in New Mexico some 22 years after the Department of Interior afforded recognition in August 1976, and two years later caused the Fort Sill Apache to appear in the Federal Register on the first list published by the Department of Interior of Tribes acknowledged to be federally recognized pursuant to 25 C.F.R. Part 54, the  regulatory predecessor to Part 83.  *See* Memorandum of Points and Authorities in Support of Plaintiff Fort Sill Apache's Motion for Summary Judgment ("Plaintiff's Memorandum") at 7–8.

Defendants have made a single passing reference to settlement of litigation among parties including the Department of Interior in the Western District of Oklahoma, Federal Defendants' Cross Motion for Summary Judgment ("Defendants' Cross Motion") at 3. They are silent with respect to the determinative significance of the Fort Sill Apache Tribe's relinquishment of the hard won right to stand on equal footing with the Tribes of the original KCA Reservation (Comanche, Kiowa and Apache of Oklahoma) in the matter of land acquisitions for gaming and other purposes, in exchange for a series of factual representations on the part of the United States, which the Fort Sill regarded as solemn promises plainly intended to open the door to gaming eligibility on the Fort Sill's 30 acre parcel in Luna County, New Mexico.   (AR000083-86).

Defendants have virtually ignored the impact of the Indian canon of statutory construction in deciding gaming eligibility; as well as the fundamental principle that the IGRA's general prohibition against gaming on after acquired lands is to be interpreted narrowly, while the exceptions are to be broadly construed.

We treat the foregoing subjects at greater length, and conclude by reiterating the request that the Court hold decisions denying gaming eligibility for the Fort Sill's lands in Luna County, New Mexico on the basis of the initial reservation and restored tribe exceptions to be "arbitrary, capricious, an  abuse of discretion [and] otherwise not in accordance with law" pursuant to 5 U.S.C. § 706(2).

## II. ARGUMENT

### A. THE INITIAL RESERVATION EXCEPTION: THE FORT SILL APACHE WERE ACKNOWLEDGED AS A TRIBE RECOGNIZED BY, AND ELIGIBLE TO RECEIVE SERVICES AND BENEFITS FROM, THE DEPARTMENT OF INTERIOR ON THE LIST REQUIRED BY THE REGULATORY PREDECESSOR TO PART 83 IN SEPTEMBER 1978

The Final Agency Decision rendered in May 2015 – during the course of the litigation – squarely held that 25 C.F.R. Part 292 does not apply to the Fort Sill Apache's claims to gaming eligibility in Luna County, New Mexico pursuant to the initial reservation and restored lands exceptions to IGRA's general prohibition against gaming on after acquired lands. ("the regulations [Part 292] do not apply to the Akela Flats parcel due to the grandfathering provision in 25 C.F.R. § 292,26(b), which states that the regulations do not apply when the DOI or the NIGC has issued an Indian lands opinion prior to the effective date of the regulation.   The NIGC's May 2008 Opinion was issued prior to the effective date of the regulations, and, therefore, the regulations do no apply."  (AR003157)).

Thus Part 292's express requirement that Tribes seeking benefit of the initial reservation exception show participation in the lengthy "federal acknowledgment process" set forth by 25 C.F.R. Part 83[2], does not apply to Fort Sill Apache Tribe's claims to gaming eligibility on lands in Luna County.  Defendants do not dispute that Akela Flats is the Tribe's initial reservation for purposes of the exception.  Defendants' Cross Motion at 12, n. 5.

Defendants have made the mistaken assertion that "[a]t the time that FSA was recognized, Part 83 applied ...."  Defendants' Cross Motion at 8.

---

[2]*See* 25 C.F.R. § 292.6(a), requiring showing "[t]he tribe has been acknowledged (federally recognized) through the administrative process under part 83 of this chapter."

The Department of Interior acknowledged the Fort Sill Apache as a federally recognized Tribe in August 1976.  (SAR00058-72),   25 C.F.R. Part 54, the regulatory predecessor to Part 83, was promulgated in September 1978.  *See* Plaintiff's Memorandum at 7.

Moreover, Defendants seem to suggest that Tribes like the Fort Sill Apache already acknowledged as federally recognized at the time the Department promulgated Part 54 in 1978 were and are nonetheless eligible to participate and achieve acknowledgment as federally recognized Tribes through the Part 83 process.  Defendants' Cross Motion at 8 ("[T]he Part 83 process applies to a petition of a previously recognized tribe that seeks current recognition on that basis" (quoting *Muwekme Ohlone Tribe v. Salazar*, 708 F.3d 209, 218 (D.D.C. 2013)).

If so, the suggestion is plainly incorrect.  The drafters of Part 54 provided that "[t]his part does not apply to Indian tribes ...which are already acknowledged as such and are receiving services from the Bureau of Indian Affairs."  *Id.*, § 54.3(b).

Initial and later versions of Part 83 have also restricted eligibility to participate in the "acknowledgment process" to Tribes "not currently acknowledged as Indian tribes by the Department."  *See* 59 Fed. Reg. 9280 (February 25, 1994), which provides as follows with respect to the "scope" of the acknowledgment process:

§ 83.3 Scope.

> (a) This part applies only to those American Indian groups indigenous to the continental United States which are **not currently acknowledged as Indian tribes by the Department**....
>
> (b) Indian tribes, organized bands, pueblos, Alaska Native villages, or communities which are **already**

> **acknowledged as such and are receiving services from the Bureau of Indian Affairs may not be reviewed under the procedures established by these regulations.**

*Id.* at 9254 (emphases added).

Defendants do not contest the dual responsibilities exercised by the Department of Interior and the National Indian Gaming Commission with respect to gaming eligible Indian lands determinations, and would be hard pressed to do so.

Indian lands and gaming eligibility determinations rendered by the NIGC and the Department of Interior's Office of the Solicitor appear on the NIGC's website.  *See* https://www.nigc.gov/general-counsel/indian-lands-opinions.  Those rendered by the NIGC almost invariably indicate concurrence in the opinion on the part of the Solicitor's Office.[3]

None of the Indian lands opinions appearing on the NIGC website indicate disagreement between the Solicitor's Office and the NIGC, though the record before the Court does show that on one important occasion David Bernhardt – then Solicitor of the Department and now Secretary of Interior – objected in very strong terms to a decision finding gaming eligibility with respect to lands of Alabama's Poarch Creek Band of Indians.  Mr. Bernhardt asserted the primacy of the Department of Interior in the matter of rendering gaming eligible Indian lands determinations:

---

[3]*See*, e.g.,
https://www.nigc.gov/images/uploads/indianlands/20181004_Big_Lagoon_Indian_Lands_Opinion_-_final_executed.pdf;
https://www.nigc.gov/images/uploads/indianlands/Cloverdale%20RL%20decision%20letter%2012.12.08.pdf

> [T]he NIGC has no general authority over the regulation of Indian
> gaming based on the ultimate purpose of the authorizing statute.
> By contrast, the scope of the Secretary's authority extends broadly
> to most matters of Indian affairs and includes implementing many
> of the laws governing relations with tribes and individual Indians.
> Moreover, based on longstanding and specific authority under the
> Indian Reorganization Act and other generally applicable Indian law,
> the Secretary has the specific authority and subject matter expertise
> to decide issues concerning Indian lands and tribal jurisdiction.  Thus,
> it is the Secretary, not the NIGC, who has the implicit authority to interpret
> any gaps in IGRA, particularly with respect to ambiguities or gaps that
> concern what constitutes Indian lands and the scope of tribal jurisdiction.

* * *

(AR002574, 2577-2578).

Defendants have nonetheless challenged as speculative the Fort Sill Apache's assertion that the Department's Office of Solicitor obviously disagreed with the NIGC decision to deny gaming eligibility pursuant to the initial reservation exception.  We set forth the basis for the assertion at some length in our opening memorandum, Plaintiff's Memorandum at 18–21, 38–39, and here would simply reiterate the  opinion rendered by Interior was the product of many months of discussion and negotiation between and among the parties, and was plainly to be directed to the initial reservation exception to IGRA's after acquired lands prohibition.

The odd correspondence filed January 17, 2017 (ECF 67–1) indicated that the NIGC had given "careful consideration" to the letter from the Office of Solicitor, but was nonetheless holding to its negative determination as to the initial reservation exception.  The particular context – months of discussion between and among the parties devoted to the exception – plainly suggests disagreement between Interior and the NIGC as to the Fort Sill Apache's eligibility to conduct gaming operations on the lands in Luna County, New Mexico pursuant to the initial reservation exception to IGRA's general prohibition with respect to gaming on after

acquired lands.

We cannot know the precise basis for disagreement, though the primary sticking point between the Fort Sill Apache and governmental parties with respect to the initial reservation exception has always been IGRA's reference to "federal acknowledgment process", and whether that necessarily means participation in the process set forth by Part 83 as a condition of eligibility for the initial reservation exception.

But we respectfully submit the **fact** of disagreement between the Office of Solicitor and the NIGC as to gaming eligibility pursuant to the initial reservation exception is evident on the record before the Court.

Whether the fact of disagreement with the Solicitor's Office that claims primacy in such determinations serves in and of itself to render the NIGC decision denying initial reservation treatment arbitrary and capricious, the disagreement should certainly weigh heavily in the Tribe's favor if the Court should decide that the Indian canon of statutory construction is indeed applicable here.

The "Indian canon" of course requires that ambiguities in statutes passed for the benefit of Indians be interpreted liberally in favor of Indian tribes. *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766 (1985). Congress plainly enacted the Indian Gaming Regulatory Act for the benefit of Indians and Indian tribes. The Act's purpose is, in most important part, "to promote tribal economic development, self-sufficiency, and strong tribal governments" and "to ensure that the Indian tribe is the primary beneficiary of the gaming operation." 25 U.S.C. §§ 2702(2) and (3). *See*, e.g., *City of Roseville v. Norton*, 348 F.3d 1020, 1032 (D.C. Cir. 2003) ("IGRA is designed to promote the economic viability of Indian Tribes…the Indian canon requires the court

to resolve any doubt in favor of the tribe"); *Artichoke Joe's Cal. Grand Casino v. Norton*, 353

F.3d 712, 730 (9th Cir. 2004) ("IGRA is undoubtedly a statute passed for the benefit of Indian

tribes. IGRA's declaration of policy…firmly places the statute in the category of legislation to

which the *Blackfeet* presumption applies); *AT&T Corp. v. Coeur D'Alene Tribe*, 295 F.3d 899,

918 (9th Cir.2002) ("because [IGRA] was enacted to benefit Indian tribes, the IGRA must be

construed liberally in favor of the Native Americans.")

   Moreover, exceptions to any statute's general policy are "sensibly read narrowly in order

to preserve the primary operation of the [policy]." *City of Edmonds v. Oxford House, Inc.*,

514 U.S. 725, 731-32 (1995). Again, IGRA's most fundamental purposes are "promot[ing] tribal

economic development, self sufficiency, and strong tribal governments through gaming." 25

U.S.C.§ 2702(1). Any exceptions to this policy should be construed narrowly. In *Grand Traverse

Band of Ottawa and Chippewa Indians v. Office of the U.S. Attorney for the Western

District of Michigan*, 369 F.3d 960 (6th Cir. 2004), the Sixth Circuit explained as follows:

> Although § 2719 creates a presumptive bar against casino style
> gaming on Indian lands acquired after the enactment of IGRA, that
> bar should be construed narrowly (and the exceptions to the bar broadly)
> in order to be consistent with the purpose of the IGRA, which is to
> encourage gaming.

*Id*. at 971.

   *See also  City of Roseville v. Norton*, *supra,* 348 F.3d at 1030-32 ((holding that the

"restoration of lands for an Indian tribe ... restored to Federal recognition" exception should be

interpreted broadly because the IGRA's exceptions "embody policies counseling for a broader

reading" due to the statute's general purpose of promoting tribal economic development and self-

sufficiency; and applying the Indian canon of statutory construction to resolve any ambiguities in

favor of a broad reading of the "restoration of lands" exception).

The Final Agency Decision of May 15, 2015 effectively precludes Defendants from establishing that Part 292 and its absolute requirement of participation in the Part 83 process applies to the Fort Sill Apache Tribe's claim to the initial reservation exception here.

Defendants' also confront a legal landscape tilting sharply in the Tribe's direction if the Court should hold the Indian canon of statutory construction applicable here.

Defendants are thus bound to argue that "the federal acknowledgment process" is a clear and unambiguous statutory reference to the acknowledgment process first established by the regulatory predecessor to  25 C.F.R. Part 83 ("Part 83") in 1978[4]; and that, as a matter of law, the phrase cannot refer to any earlier administrative process by which a Tribe achieved acknowledgment as federally recognized tribe and eligible to receive benefits and services from the Department of Interior and its Bureau of Indian Affairs, even if such earlier acknowledgment as a federally recognized tribe took place pursuant to the regulation's initial and express requirement that the Department of Interior publish a list of Tribes acknowledged as federally recognized to date.

There is now a new thread running through Defendants' interpretation of the phrase "the federal acknowledgment process", deriving from a recent Supreme Court decision. *See* Defendants' Cross Motion at 14, citing *Nielsen v. Preap,* 139 S.Ct. 954, (2019) and the following language: "Here grammar and usage establish that "the" is "a function word ... indicat[ing] that a

---

[4]If the Court were to agree, the Indian canon would not then apply.  *See South Carolina v. Catawba Indian Tribe, Inc*., 476 U.S. 498, 506, 106 S.Ct. 2039, 90 L.Ed.2d 490 (1986) ("The canon of construction regarding the resolution of ambiguities in favor of Indians . . . does not permit reliance on ambiguities that do not exist; nor does it permit disregard of the clearly expressed intent of Congress.").

following noun or noun equivalent is definite or **has been previously specified by context**...."
(Emphasis added, citation omitted).

The closely divided *Nielsen* court held in an immigration context that a statutory reference to "the alien" – there an alien taken into custody years after the crime that made him subject to immediate incarceration and potential deportation depending whether earlier statutory references to "alien" applied – served to "previously specif[y] by context" and render "the alien" subject to incarceration years after the offense took place.

Here, the phrase "federal acknowledgment process" appears just once in IGRA, and goes unmentioned in the legislative history.  There is no "previous specif[ication] by context" to apply and hold that "the federal acknowledgment process" can only mean reference to Part 83.

In *Koi Nation of Northern California v. United States Department of Interior* 361 F.Supp.3d 14 (DDC 2019) ("*Koi Nation")*, *appeal pending*, No. 19–5069 (D.C. Cir., March 25, 2019), the judicial predicate  for the "*de facto* termination" of a government to government relationship with respect to the restored tribe element of the restored lands exception echoed the earlier administrative finding rendered by the NIGC as to the Karuk Tribe of California:

> On December 29, 2000, DOI's Assistant Secretary of Indian Affairs, Kevin Gover, issued a letter to the Koi Nation,.... After acknowledging "the long-standing and unfortunate omission" of the Koi Nation "from recognition and services" by BIA following the Lower Lake Act and Rancheria Act [of 1956], DOI's Assistant Secretary of Indian Affairs "reaffirm[ed] the Federal recognition" of the Koi Nation and directed that the Koi Nation be included on the Secretary's list of federally recognized tribes....

*Id.* at 28 (citation omitted).

-11-

However, Defendants have not invoked *Koi Nation* for purposes of the restored lands exception actually before the court there, and the *de facto* administrative termination of the government to government relationship held to be sufficient.  Defendants refer rather to the following passage relating to the initial reservation exception:

> [T]he "initial reservation" exception to IGRA's prohibition on gaming on after-acquired lands, which immediately precedes the restored lands exception in Section 20. See 25 U.S.C. § 2719(b)(1)(B)(ii). Congress limited the availability of that "initial reservation" exception to tribes that achieved recognition through the "Federal acknowledgment process." See *id.* ("Subsection (a) will not apply when . . . lands are taken into trust as part of . . . the initial reservation of an Indian tribe acknowledged . . . under the Federal acknowledgment process."

*Id*. at 45.

It is doubtful the *Koi Nation* court's treatment of the initial reservation exception was necessary to decision as to gaming eligibility pursuant to the restored lands exception; and if not, the Court should find the foregoing discussion of the initial reservation exception in *Koi Nation* to be *dicta*.[5]

Moreover, Koi Nation achieved renewed acknowledgment as a federally recognized Indian Tribe by administrative *fiat* 22 years after promulgation of 25 C.F.R. Part 54; and presumably appeared thereafter on a subsequent list of federally recognized published by the Department of Interior.

The Fort Sill Apache appeared on the first list of Tribes expressly acknowledged to be federally recognized, a list published pursuant to Part 54.  Thus we respectfully submit, first, that

---

[5]*See*, e.g., *United States v. Crowley*, 837 F.2d 291 (7th Cir. 1988) (Posner, J.), where the Seventh Circuit defined *dicta* in part most relevant here as "unnecessary to the outcome of the case and therefore perhaps not as fully considered as it would have been if was essential to the outcome."  *Id.* at 292.

the "the federal acknowledgment process" does not represent a clear and unambiguous reference

to Part 83; and second, that the phrase can reasonably apply to the Fort Sill Apache Tribes'

acknowledgment as a federally recognized Tribe in 1976; and subsequent appearance on the first

list of federally recognized published by the Department of Interior pursuant as required by then

– Part 54.

### B.  THE FORT SILL APACHE TRUST LANDS AT AKELA FLATS ARE ALSO GAMING ELIGIBLE PURSUANT TO THE IGRA'S "RESTORATION OF LANDS" EXCEPTION

Plaintiff has recounted at some length the tragic 27 year history of the Chiricahua Apache

as prisoners of war, which the Fort Sill Apache submit plainly resulted in the decimation of their

Chiricahua ancestors and effective destruction of the Chiricahua as a distinct Tribal entity

capable of maintaining any government to government relationship with the United States.[6]

Plaintiff's Memorandum at 1–4.

Plaintiff has also addressed the long, hard struggle waged by survivors of the experience

who remained in Oklahoma, and their descendants, eventually to organize themselves, and 63

years later become formally acknowledged as a recognized Tribe eligible to receive services and

benefits, in the first list of such Tribes ever compiled by the Department of Interior in keeping

with the requirements of 25 U.S.C. Part 54, the regulatory predecessor to Part 83.  *Id.* at 5–8.

---

[6]*Black's Law Dictionary* (4th Ed. 1951) defines "government" in part as "[t]he machinery by which the sovereign power in a state expresses its will and exercises its functions; or the framework of political institutions ... by means of which the ... business of the state is carried on." *Black's* also defines "govern" as "to direct and control the actions or conduct of, either by established laws or arbitrary will; to direct and control, rule, or regulate, by authority." The prisoners of war in no sense maintained the capacity to "govern", and in no sense maintained a "government- to-government relationship" with the United States, at any time after Geronimo's final surrender to the United States Army on September 4, 1886.

Plaintiff's treatment of the record of an especially tragic episode in the history of the United States' dealings with the American Indian has prompted the following observation from Defendants: "The basis of the Tribe's contention [that no government to government relationship could possibly have survived such an experience] appears to be that the imprisonment of Apache as prisoners of ward (even those who may have served as scouts for the United States) amounted to *de facto* termination of government recognition.  *See* AR 003160."  Defendants' Cross Motion at 18.

Defendants then argue that the appropriation of monies towards the physical survival of the prisoners of war – the Fort Sill Apache do not contend the United States denied their ancestors food and shelter for the period of their imprisonment – should weigh against any finding that the imprisonment served to end a government to government relationship with the United States:

> The administrative record fully supports [the NIGC's] conclusion
> [that the 27 year imprisonment did not serve to termination the
> government to government relationship].  For example, when
> the Tribe was settled on the Fort Sill Military Reserve in 1894,
> Congress thereafter appropriated funds for the "maintenance and
> support" **of the Tribe.**  AR000437–38.  In 1897, President Cleveland
> signed an executive order establishing a portion of the Fort Sill Military
> Reserve as a "permanent location" **for the Tribe.**  AR000441.

*Ibid.* (emphases added).

In fact the material (cited in a decision of the Indian Claims Commission) described provision being made, not for  "the Tribe" but for "Apache prisoners", "prisoners of war", or simply "Indians":

> The Apache prisoners arrived at Fort Sill In October 1894. They
> were at first quartered in tents and encouraged thus to live outside

-14-

to help alleviate the tuberculosis from which many of them were
suffering. Over the first two years of their settlement at Fort Sill,
they constructed houses in several small communities of relatives
at various points across the Fort Sill Military Reservation.

Further funds were appropriated for their "maintenance and support"
as "prisoners of war" by the Acts February 12, 1895, 28 Stat. 654, 658,
and March 16, 1896, 29 Stat. 60, 64.

* * *

On January 6, 1896, the Secretary of War wrote, in part as follows,
to the Secretary of the Interior:

> ... It is hoped that at the close of the fiscal year
> 1896-7 there will be no necessity for holding these
> Indians longer in the status of prisoners, and that then
> they can be released as such and their control assumed
> by your Department.

* * *

(AR000438).

The War Department was to "hold[] these Indians ... in the status of prisoners", living

peacefully and productively – even if involuntarily – on the lands of the Fort Sill Military

Reservation for another 17 years.[7]

As for Executive Orders mentioned in this same decision of the Indian Claims

Commission,

> [O]n February 26, 1897, President Grover Cleveland signed an
> Executive order stating, in pertinent part, as follows:
>
> > tracts of land located on the Kiowa, Comanche and
> > Apache Reservation in the Territory of Oklahoma
> > . . . are hereby set apart and added to the military

---

[7] When the War Department was eventually persuaded to release them, it was not on
humanitarian grounds or on account of the somber reality that by then a majority of the survivors
had been born in captivity: It had become "apparent that the continued presence of the Apache
prisoners severely inhibited the use of Fort Sill for field artillery training....  The army's need for
Fort Sill as a military installation was considered paramount ...."  AR000447–448.

> reservation at Fort Sill, Ok., for exclusive use for
> military purposes and for the permanent location
> thereon of the Apache Prisoners of War... (citation omitted).
> * * *

In 1901, 893.07 acres composed of fractional portions of sections
were added to the Fort Sill Military Reservation at the request
of the War Department. These additions were made by Executive
order of September 20, 1901, "for the use and benefit of the Apache
prisoners of war." ... (citation omitted).

(AR000441).

Defendants also argue that "some of the supplemental administrative record material

submitted by the Tribe indicates that the relationship was not terminated.  For example, in

December 1975, the Tribe sent a memo to members saying that 'The Fort Sill Apache Tribe of

Oklahoma has entered a contract with the government for the purpose of providing means by

which the Tribe can strengthen tribal government functions ....'  Supp-AR-000014.  In March

1976, it appears the Anadarko Agency issued a payment of $1,174.67 to the 'Fort Sill Apache

Tribe in accordance with the provisions of the above referenced contract.'  Supp–AR–000014.  If

there truly had been no government–to–government relationship recognized, it seems unlikely

that the Anadarko Agency would have been entering contracts and paying money the Tribe

months before FSA claims the Tribe was recognized in August 1976."  Defendants' Cross

Motion at 19.

Defendants would thus fast forward 62 years – from 1913 to 1975 – with no reference

in the intervening years to documentary evidence of a continuing relationship of any kind

between the United States and individual survivors of the imprisonment and their descendants

who remained in Oklahoma.

But in any case, the survivors' long, hard struggle to forge a distinct Tribal identify –
including the communications with the Department of Interior in 1975 relating to modest funding
towards strengthening tribal governance, towards the petition for formal acknowledgment as the
Fort Sill Apache Tribe of Oklahoma the following year – hardly serves to establish a government
to government relationship between the United States and Chiricahua ancestors:
Any such relationship had been extinguished nearly a hundred years before.

Defendants consistent and intractable position with respect to the purported
non–termination  a government to government relationship – despite the evident destruction
of the Chiricahua Apache – seems to us tacit acknowledgment that the unique record before the
Court here would likely warrant a determination that the restored lands exception applies to the
Fort Sill Apache reservation lands in Luna County, New Mexico.

Such a determination would necessarily mean application of the Indian canon of statutory
construction and related principles in deciding whether Fort Sill Apache's reservation lands in
Luna County represent a "restoration of lands" within the meaning of the exception.

And the courts have construed the restoration of lands element very broadly consistent
with the Indian canon.  *See,* e.g., *City of Roseville*, *supra,* 348 F.3d at 1027 (explaining that the
term "restored land" in IGRA's restored lands exception could mean "to `bring [it] back to an
original state'" or alternatively "encompass[] the concept of . . . **restitution for past wrongs**"
(emphasis added); *see also  Grand Traverse Band of Ottawa & Chippewa Indians v. Office of
U.S. Att'y. for W.* Div. *of Mich*., 369 F.3d 960, 967 (6th Cir. 2004) ("The district court
appropriately looked to the dictionary definitions of `restore' and `restoration,' which include the
following meanings: to give back, return, **make restitution**, reinstatement, renewal, and

reestablishment." (emphasis added)).

Defendants have argued against the restored lands exception for the site in Luna County

as follows:

> NIGC identified the three factors to determine whether the land
> qualified for the exception: 1) the factual circumstances of the
> acquisition; 2) the location of the acquisition; and 3) the temporal
> relationship of the acquisition to the tribal restoration. AR003160.
> NIGC extensively analyzed three factors in its May 2008 Opinion.
> AR000062-70. On the factual circumstances of the acquisition, NIGC
> found that the Tribe had purchased seven parcels totaling over eighty-two
> acres of land in Oklahoma before it purchased the Akela Flats property
> in New Mexico.  AR00064-65. This indicated that the Akela Flats
> parcel was not part of the Tribe's initial attempts to build its land base
> after restoration. With regard to the location of the acquisition, NIGC
> found that the Tribe had established a historical connection to the land
> because it was in lands historically occupied by the Tribe, and it appears
> to have been part of their aboriginal territory. AR000067-68. However,
> in evaluating the Tribe's modern connection to the land, NIGC determined
> that the Tribe did not show any modern connection to the land from the time
> the Chiricahua were removed in 1886 until the purchase of Akela Flats
> in 1998. AR000068. In addition, Akela Flats is located over 540 miles from
> the nearest FSA governmental offices AR000069. And no tribal members
> ` lived on the Akela Flats property or adjacent to it. *Id*. Accordingly, NIGC
> concluded that the Tribe had failed to establish evidence of modern
> connections to the land. AR000070. Finally, NIGC found that the Tribe
> waited nearly twenty– three years from the time it was recognized in 1976
> until it purchased the Akela Flats parcel in 1998. AR000062-64. Although
> the lapse of twenty-three years may not have been determinative in and
> of itself, the lack of evidence establishing the other factors caused
> NIGC to conclude that FSA had failed to show that the Akela Flats
> ` parcel satisfied the restored lands exception. AR000063.

Defendants' Cross Motion at 20–21.

We submit the reference to "seven parcels totaling over eighty-two acres of land in

Oklahoma", *id.* at 20 – as if the Tribe then had the wherewithal to invest in lands elsewhere – is

 disingenuous.

-18-

In August 1976, the Department of Interior's Associate Solicitor for Indian Affairs documented the Fort Sill Apache's dire economic condition as the Tribe struggled to establish a land base for common Tribal purposes, and to forge equal land acquisition and Indian gaming rights in the lands of the former KCA Reservation:

> [T]he Fort Sill Apache Tribe is small with few resources and a very small land base. Their history as prisoners of war settled in Oklahoma is compelling.  Their prospects for tribal economic development are small to nonexistent since they have no current projects and no future prospects other than the proposed gaming operation.  The ability of the Tribe to provide needed services to its members it limited by the severe economic circumstances of the Tribe. The history of the Fort Sill Apache Tribe and its desperate economic situation presents a persuasive case for intervention by the Central Office [in Washington].

(SAR00095).

Yet despite very difficult economic conditions, even as the Tribe was struggling to establish a gaming operation in Lawton, Oklahoma on land that would not be taken into trust for the Fort Sill until 1999 (SAR00099),  the record shows the Tribe nonetheless intent on developing a presence in the aboriginal homeland of their ancestors, and proceeding to acquire the 30 acre parcel in Luna County in 1998.

When the Department of Interior took the parcel at Akela Flats into trust four years later, the Acting Regional Director of the Bureau of Indian Affairs Southwest Region described the Tribe's aspirations in acquiring the land as follows:

> The Tribe is seeking to reestablish its presence in its aboriginal and former reservation territories.  The first step will be placing of this 30–acre parcel into trust.  The Tribe chose this particular piece of property because of cost, the location in the Tribe's aboriginal and former reservation territories and its close proximity to historical and culturally significant areas for both descendants of the Chiricahua and Warm Springs Tribes....

-19-

(AR001502).

As for the Tribe's purported lack of "any modern connection to the land", Defendants would have the Court reject the restoration of lands element of the exception because of the enduring effects of the 27 year imprisonment itself ("Tribe did not show any modern connection with the land from the time the Chiricahua were removed in 1886 until the purchase of Akela Flats in 1998").  Defendant's Cross Motion at 20–21

The argument depends on a fundamentally flawed premise in this unique context, that the significance of the aboriginal lands of the Chiricahua from time immemorial have somehow diminished for their descendants in proportion to the distance from the lands in Oklahoma where the United States Military transported each and every man, woman and child among them as prisoners of war in 1894.

We respectfully submit the unique and tragic circumstances of the Fort Sill Apache's Chiricahua ancestors and the forced removal of every man, woman and child among them warrant a fundamentally different calculus:  Distance between Apache, Oklahoma and aboriginal lands of the Chiricahua where they are now forging a place for themselves despite all obstacles is a direct measure of the continuing and incalculable significance for the Fort Sill Apache Tribe of newly designated reservation lands in Luna County, New Mexico.

The same flawed premise undermines Defendants' efforts to distinguish the much different experience of the Karuk Tribe of California before the NIGC, which ultimately approved gaming eligibility on the basis of the restored lands exception.  Defendants' Cross Motion at 22.

-20-

Most fundamentally, Defendants have simply missed what we continue to submit is the determinative significance of a settlement calling for the Fort Sill Apache to relinquish fundamental and hard won land acquisition and gaming rights in Oklahoma, in exchange for representations on the part of the Department of Interior that the Fort Sill Apache plainly and reasonably understood would serve to establish gaming eligibility for Akela Flats based on the restored lands exception; and – once the promised Reservation Proclamation took place – the initial reservation exception. (AR000083–86).

We respectfully submit that the record before Court warrants a judicial determination of gaming eligibility on reservation lands of the Fort Sill Apache Tribe in Luna County, New Mexico on the basis of initial reservation and restored lands exceptions to IGRA's general prohibition against gaming on after acquired lands.

## CONCLUSION

For the foregoing reasons, and for such additional reasons as have been asserted in Plaintiff's Memorandum, the Fort Sill Apache Tribe respectfully requests that this Court find that decisions denying gaming eligibility on reservations lands on Luna County, Oklahoma pursuant to IGRA's initial reservation and restored lands exceptions are "arbitrary, capricious, an  abuse of discretion [and] otherwise not in accordance with law" pursuant to 5 U.S.C. § 706(2).

Respectfully submitted,

**/s/ John P. Racin                              **
John P. Racin  Bar No. 942003
Law Office of John P. Racin
1721 Lamont Street, N.W.
Washington, D.C .  20010

-21-

(202) 277.7691
Fax: 202.296.5600
Email: johnpracin@gmail.com


**/s/ Phillip E. Thompson**
Thompson & Associates
P.O. Box 467
Point of Rocks, MD 21777
(301) 535-0488
Fax: (202) 905-0057
Email: philliptho@me.com


**/s/ Robert E. Prince**
Law Office of Robert E. Prince
632 S.W. "D" Avenue
Lawton, OK 73501
(580) 248-8015
Fax: (580) 353-6888
Email: reprince@fidnet.com


**Attorneys for Plaintiff**
**Fort Sill Apache Tribe**


**<u>CERTIFICATE OF SERVICE</u>**

The foregoing *Plaintiff Response to Defendants' Cross Motion for Summary Judgment, and Reply to Defendants' Response to Plaintiff's Motion for Summary Judgment* will be served to the following counsel for Defendants in this case by the Court's CM/ECF system after proper filing of an Adobe PDF version of the above items on the Court's secure website on November 25, 2019:

Brian Matthew Collins
U.S. DEPARTMENT OF JUSTICE
ENRD
P.O. Box 7611
Washington, DC 20044
(202) 305-0428

Fax: 202-305-0506
Email: brian.m.collins@usdoj.gov

*/s/ John P. Racin*
John P. Racin