## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**FORT SILL APACHE TRIBE,**

       **Plaintiff,**

    **v.**

**NATIONAL INDIAN GAMING COMMISSION, *et al*.,**

       **Defendants.**

**Civil Action No. 14-958 (ESH)**

## <u>MEMORANDUM OPINION</u>

Plaintiff Fort Sill Apache Tribe (the "Fort Sill Apaches" or the "Tribe"), a federally recognized Indian tribe, brought this action against the National Indian Gaming Commission (the "NIGC"); Jonodev Chaudhuri, Chairman of the NIGC; the Department of the Interior ("DOI"); Ryan Zinke, Secretary of the Interior;[1] Michael Black, Assistant Secretary of Indian Affairs; and the United States. The Tribe claims that the NIGC violated the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq.*, by ruling that gaming on the Tribe's lands at Akela Flats, New Mexico, would violate the Indian Gaming Regulatory Act (the "IGRA"), 25 U.S.C. §§ 2701 *et seq.* Before the Court are the parties' cross-motions for summary judgment. For the reasons stated herein, the Court will grant defendants' motion for summary judgment and deny the Tribe's motion.

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), if a public officer named as a party to an action in his official capacity ceases to hold office, the Court will automatically substitute that officer's successor. Accordingly, the Court substitutes David Barnhardt for Ryan Zinke.

## BACKGROUND

### I.   STATUTORY AND REGULATORY FRAMEWORK

Because this case implicates the federal government's formal acknowledgment of Indian

tribes and a tribe's ability to conduct gaming on its lands, it is necessary to review the statutes

and regulations governing these matters.

#### A.   Federal Acknowledgement of Indian Tribes

Historically, the federal government recognized Indian tribes through treaties, executive

orders, and acts of Congress.  *Mackinac Tribe v. Jewell*, 829 F.3d 754, 755 (D.C. Cir. 2016).

Even with the passage of the Indian Reorganization Act (the "IRA") in 1934, federal recognition

of Indian tribes "proceeded in an ad hoc manner, . . . with the Bureau of Indian Affairs [(the

"BIA")] reviewing petitions for federal recognition on a case-by-case basis." *Id.* at 756.

"Finally, in 1978, [DOI] promulgated Part 83 of its regulations under the IRA (also known as the

Federal Acknowledgment Process), which set out uniform procedures through which Indian

groups could seek formal recognition." *Id.*  "The[se] regulations established the first detailed,

systematic process for review of petitions from groups seeking Federal acknowledgment."

Procedures for Establishing That an American Indian Group Exists as an Indian Tribe, 59 Fed.

Reg. 9,280, 9,280 (Feb. 25, 1994).  The process set forth in Part 83 applied only to Indian tribes

that had not achieved federal recognition and did not apply to those tribes "already [federally]

acknowledged . . . and . . . receiving services from the [BIA]."  25 C.F.R. § 54.3(b) (1978).[2]

Additionally, the regulations required the Secretary of DOI (the "Secretary") to publish annually

---

[2] These regulations were initially designated as 25 C.F.R. Part 54 and later designated without change as 25 C.F.R. Part 83.  59 Fed. Reg. at 9,280.

"a list of all Indian tribes which are recognized and receiving services from the [BIA]."[3]  25

C.F.R. § 54.6(b) (1978).

### B.   The Indian Gaming Regulatory Act

Congress enacted the IGRA in 1988 "to provide a statutory basis for the operation of

gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency,

and strong tribal governments."  25 U.S.C. § 2702(1).  The IGRA allows Indian tribes to conduct

or permit "Class II" and "Class III" gaming activities on eligible "Indian lands."  25 U.S.C.

§ 2710(b)(1), (d)(1).  Section 20(a) of the IGRA, 25 U.S.C. § 2719(a), expressly prohibits such

gaming "on Indian land taken into trust by the Secretary after IGRA's effective date, October 17,

1988, unless the land borders an existing reservation or is within the last recognized reservation

of a tribe that was landless at the time IGRA was enacted (unless the tribe is in Oklahoma, in

which case lands bordering [the tribe's] former reservation are exempted as well)."  *City of*

*Roseville v. Norton*, 348 F.3d 1020, 1024 (D.C. Cir. 2003).  Section 20(a)'s prohibition is subject

to two categories of exceptions provided for in Section 20(b).  *See* 25 U.S.C. § 2719(b).  The

first, Section 20(b)(1)(A), allows the Secretary to permit gaming on lands otherwise prohibited

by Section 20(a) under certain circumstances.  The second exception, Section 20(b)(1)(B), which

is relevant to this case, "exempts lands taken into trust as part of the 'settlement of a land claim,'

'the initial reservation of an Indian tribe acknowledged by the Secretary,' or the 'restoration of

lands for an Indian tribe that is restored to federal recognition.'"  *City of Roseville*, 348 F.3d at

1024 (describing 25 U.S.C. §§ 2719(b)(1)(B)(i), (b)(1)(B)(ii), (b)(1)(B)(iii)).

---

[3] Since 1994, the requirement that the Secretary publish a list of federally recognized tribes has been imposed by statute.  *See* 25 U.S.C. § 5131(a).

The IGRA established the NIGC as an entity within DOI and charged it with ensuring that gaming on Indian lands is conducted consistent with the IGRA.  25 U.S.C. §§ 2704–06.[4] The IGRA grants the Chairman of the NIGC the power "to levy and collect appropriate civil fines . . . against the tribal operator of an Indian game or a management contractor engaged in gaming for any violation of any provision of [the IGRA]."  25 U.S.C. § 2713(a)(1); *see also* 25 U.S.C. § 2705 (defining the powers of the Chairman).  Tribes that are fined by the Chairman have the opportunity to appeal to the full NIGC.  25 U.S.C. § 2713(a)(2).  Because the NIGC is part of DOI, the Secretary of DOI may review NIGC decisions.  43 C.F.R. § 4.5(a)(2).

## II.    FACTUAL AND PROCEDURAL BACKGROUND[5]

The predecessors of the Fort Sill Apache Tribe, the Chiricahua and Warm Springs Apache Tribes (the "Chiricahua Apaches"), originated in what is now Arizona and New Mexico. (Administrative Record ("AR") 84)  After the conclusion of the war between the United States and the Apache leader Geronimo and his people in the late nineteenth century, the United States Army took the Chiricahua Apaches as prisoners of war.  (AR 3145)  The Army forcibly relocated them to military prisons in Florida, Alabama, and, finally, Oklahoma, where they

---

[4] In 2008, DOI promulgated regulations implementing Section 20 of the IGRA.  *See* Gaming on Trust Lands Acquired After October 17, 1988, 73 Fed. Reg. 29,354 (May 20, 2008) (codified at 25 C.F.R. Part 292).  Those regulations do "not apply to applicable agency actions when, before the[ir] effective date [of August 25, 2008,] . . . [DOI] or the [NIGC] issued a written opinion regarding the applicability of [Section 20]."  25 C.F.R. § 292.26; *see also* Gaming on Trust Lands Acquired After October 17, 1988; Correction, 73 Fed. Reg. 35,579, 35,579 (June 24, 2008) (correcting effective date).  Because the NIGC issued an opinion on May 19, 2008, prior to the effective date of these regulations, they do not apply here.  (Administrative Record ("AR") 3157)

[5] The background of this case has also been set forth in detail by Judge Rosemary Collyer in *Fort Sill Apache Tribe v. NIGC*, 103 F. Supp. 3d 113 (D.D.C. 2015), and *Fort Sill Apache Tribe v. NIGC*, 317 F. Supp. 3d 504 (D.D.C. 2018).  Subsequent to her retirement, the case was assigned to this Court.

remained imprisoned until 1913.  (AR 3146)  Upon release, many members of the Chiricahua Apaches returned to New Mexico, but seventy-six members stayed in Oklahoma, resettled on land allotted in trust for the benefit of members of the three original tribes of Oklahoma—the Comanche, the Kiowa, and the Apache—(the "KCA Reservation"), and organized as the Fort Sill Apache Tribe.  (AR 3146; AR 84)  In 1976, the Commissioner of Indian Affairs formally approved the Tribe's Constitution and acknowledged the Tribe as federally recognized.  (AR 85)  The United States and the Tribe have maintained a government-to-government relationship since that time.  (AR 3146)

In an effort to open a gaming facility, the Tribe sought to acquire land in trust on the KCA Reservation.  (AR 79)  In 1999, DOI transferred trust title in a 0.53-acre parcel on the KCA Reservation for the benefit of the Tribe.  (*Id.*)  In 2005, the Comanche Nation of Oklahoma sued the United States challenging the land transfer as invalid because the government failed to seek Comanche approval beforehand (the "Comanche litigation").  *See* Compl., *Comanche Nation v. United States*, No. CIV-05-328, ECF No. 1 (W.D. Okla. Mar. 23, 2005).  The Fort Sill Apache Tribe intervened in the lawsuit.  (AR 80)  In 2007, the three parties entered into a settlement agreement, in which the Tribe agreed to withdraw and abandon any applications for property on the KCA Reservation.[6]  (AR 81)  In exchange, the government agreed "to accept and timely process" the Tribe's application for a reservation proclamation on land held in trust for the Tribe in Akela Flats, New Mexico, an area within the aboriginal lands of the Chiricahua Apaches.[7]  (AR 85)

---

[6] The Tribe was allowed to keep the 0.53-acre parcel at issue in the litigation.  (AR 81)

[7] The parties also agreed that the Fort Sill Apache Tribe is the successor-in-interest to the Chiricahua Apaches, that the United States once maintained a government-to-government relationship with the Chiricahua Apaches, that the United States no longer recognized the

### A. The 2008 Opinion of the NIGC

Following the conclusion of the Comanche litigation, the Tribe sought to open a gaming facility on its Akela Flats territory.  In response to requests for information from the NIGC in January 2008, the Tribe submitted documents in support of its plan to conduct gaming there. (AR 3138–39)  In February 2008, the Acting General Counsel of the NIGC sent a letter to the Tribe stating her "preliminary view" that gaming at Akela Flats would violate the IGRA.  (AR 3139–40)  After further exchanges between the Tribe and the NIGC, on May 19, 2008, the Tribe withdrew its application to game at Akela Flats.  (AR 3141)  That same day, the Acting General Counsel of the NIGC issued an advisory opinion concluding that gaming on Akela Flats was barred by Section 20(a) of the IGRA and that the Tribe could not meet any of Section 20(b)'s exceptions (the "2008 Opinion").  (*See* AR 44–73)  With regard to the IGRA's restored lands exception, 25 U.S.C. § 2719(b)(1)(B)(iii), the NIGC accepted the Tribe's claim that the federal government recognized both the Chiricahua Apaches and the Tribe but concluded that the Tribe failed to show that the government ever terminated its recognition of either tribe, a requirement of the exception.  (AR 58–61)  Specifically, the NIGC rejected the Tribe's argument that the imprisonment of the Chiricahua Apaches after Geronimo's surrender constituted a termination of the government-to-government relationship.  (AR 59–60)  The NIGC found that "the United States military forces' decision to take the Chiricahua[ Apaches] as prisoners of war indicate[ed] that the Tribe was still considered a hostile but separate and sovereign entity."  (AR 60)

The NIGC also concluded that Akela Flats failed to meet another requirement of the restored lands exception, namely, that its acquisition be part of a "restoration of lands."  (AR 61–

---

Chiricahua Apaches, and that the United States maintains a government-to-government relationship with the Fort Sill Apaches.  (AR 84–85)

70)  To determine whether the land met this requirement, the NIGC applied the three-factor

balancing test used by courts, which analyzes "(1) the factual circumstances of the acquisition,

(2) the location of the acquisition," and "(3) the temporal relationship of the acquisition to the

tribal restoration."  (AR 62)  As to the first factor, the NIGC concluded that "the evidence does

not support the idea that Akela Flats is part of the Tribe's initial attempts to reestablish its land

base" because the Tribe had "focused its land acquisition efforts not in New Mexico but in

Oklahoma," where it had made seven separate purchases prior to its purchase of Akela Flats.

(AR 63–65)  The NIGC concluded that the second factor also did not support the Tribe's claim

because, although Akela Flats was historically significant to the Tribe, the Tribe lacked a modern

connection to the land.  (AR 67–70)  The NIGC found that the Tribe had no contact with the land

until 1998, all major tribal government offices were located over 540 miles away, and no tribal

members lived on or near the land.  (AR 68–70)  Finally, the NIGC concluded that the third

factor weighed against the Tribe's claim because "the Tribe waited 23 years from recognition to

acquire Akela Flats and request that it be placed into trust for gaming."  (AR 62–63)

In the 2008 Opinion, the NIGC also concluded that Akela Flats did not meet the initial

reservation exception, 25 U.S.C. § 2719(b)(1)(B)(ii), because that exception only applies to

tribes acknowledged through the process set forth in 25 C.F.R. Part 83.  (AR 72–73)  The NIGC

rejected the Tribe's argument that "the Federal acknowledgement process" is ambiguous and

instead concluded that the phrase "is a term of art that is commonly understood to refer to the

regulations adopted by the Secretary [of DOI] in Part 83."  (AR 72)  Moreover, the NIGC noted

that "the recognition of tribes prior to the development and implementation of [Part 83] cannot

be fairly identified as a process."  (*Id.*)  Because the Tribe did not achieve federal recognition

through 25 C.F.R. Part 83, the NIGC concluded that it could not benefit from the initial

reservation exception.  (AR 73)  The Solicitor's Office of DOI concurred with the 2008 Opinion.
(AR 1257)

## B.  The 2009 Opinion of the NIGC

The Tribe challenged the 2008 Opinion before the Oklahoma federal district court that
was overseeing the Comanche litigation, arguing that the 2008 Opinion breached the settlement
agreement by failing to acknowledge the Tribe's restored status allegedly set forth in the
agreement.  (AR 36–37; AR 3141)  *See also* Suppl. Br. in Supp. of Mot. for Enforcement of
Agreement of Compromise & Settlement, *Comanche Nation v. United States*, No. CIV-05-328,
ECF No. 102 (W.D. Okla. July 31, 2008).  The NIGC responded to the Tribe's new argument in
a "supplement" to its 2008 Opinion issued on April 30, 2009 (the "2009 Opinion").  (AR 36–43)
In the 2009 Opinion, the NIGC concluded that the facts agreed upon in the settlement agreement
did not show that the United States had terminated its government-to-government relationship
with the Tribe and, thus, the Tribe remained ineligible to conduct gaming at Akela Flats.[8]  (AR
43)  The Solicitor's Office of DOI again concurred with the NIGC's 2009 Opinion.  (AR 1416)

## C.  Notice of Violation 09-35

In the weeks before the 2009 Opinion was published, the Tribe opened a casino and
began conducting gaming on Akela Flats in April of 2009.  (AR 8–9; AR 24–25; AR 3142)  The
NIGC became aware of this and, on July 21, 2009, issued Notice of Violation 09-35
("NOV-09-35") for gaming on Indian lands not eligible for gaming under the IGRA.  (*Id.*; AR 1–

---

[8] The district court overseeing the Comanche litigation ultimately concluded that the 2009
Opinion did not violate the settlement agreement because the 2009 Opinion was not a final
agency action.  Tr. of Aug. 21, 2009 Hr'g at 31–32, *Comanche Nation v. United States*, No. CIV-
05-328, ECF No. 146 (W.D. Okla. May 10, 2018).  For this reason, the court denied the Tribe's
motion for enforcement of the settlement agreement.  Minute Order, *Comanche Nation v. United
States*, No. CIV-05-328, ECF No. 145 (W.D. Okla. Aug. 21, 2009).

7)  NOV-09-35 adopted the 2008 Opinion and the 2009 Opinion, and ordered the Tribe to cease

gaming activities or else face civil fines of up to $25,000 per day.  (AR 5–6)  On August 20,

2009, the Tribe timely appealed NOV-09-35 to the full NIGC.  (AR 2269)

### D.  The 2015 Decision of the NIGC

On May 5, 2015, the NIGC issued a decision on the Tribe's appeal of NOV-09-35 (the

"2015 Decision").  (AR 3134–67)  The 2015 Decision upheld NOV-09-35 and adopted much of

the reasoning of the 2008 Opinion.  With regard to the restored lands exception, the NIGC

accepted the analysis of the 2008 Opinion and again concluded that Akela Flats was not restored

land.  (AR 3160)  The NIGC also adopted the reasoning of the 2008 Opinion regarding the

application of the initial reservation exception and concluded that the Tribe could not benefit

from that exception because the Tribe had not been recognized through the process set forth in

25 C.F.R. Part 83.  (AR 3162–63)

### E.  The Current Litigation

Since the full NIGC had not ruled on the Tribe's appeal for almost five years, the Tribe

initiated this action on June 6, 2014.  (*See* Compl., ECF No. 1.)  The initial complaint alleged

two violations of the APA: (1) that defendants unreasonably delayed their decision on the Tribe's

appeal in violation of 5 U.S.C. § 706(1), and (2) that NOV-09-35 is arbitrary, capricious, an

abuse of discretion, or otherwise not in accordance with the law in violation of 5 U.S.C.

§ 706(2).[9]  (*Id.* ¶¶ 96–128.)

---

[9] Unaware of the 2015 Decision, the Court issued an opinion ten days later, on May 15, 2015,
holding that the Court had jurisdiction over the Tribe's unreasonable delay claim but not over the
claim that the NIGC violated the APA by issuing NOV-09-35 because that decision was on
appeal and was therefore not a final agency action.  *Fort Sill Apache Tribe*, 103 F. Supp. 3d at
119–22.

After the issuance of the 2015 Decision, the Tribe filed a motion to amend its complaint, which the Court granted.  (Mot. for Leave to File Am. Compl., ECF No. 23; Minute Order, July 20, 2015.)  The First Amended Complaint included three claims: (1) that the 2015 Decision was arbitrary and capricious and unsupported by substantial evidence, (2) that the NIGC acted arbitrarily and capriciously in forcing the closure of the Tribe's casino at Akela Flats, and (3) that defendants breached the settlement agreement in the Comanche litigation.  (1st Am. Compl. ¶¶ 109–50, ECF No. 30.)  Shortly thereafter, the parties entered into lengthy settlement discussions, which resulted in the submission of a joint proposed order that would first require DOI to issue a letter providing its position regarding the Tribe's gaming eligibility at Akela Flats, and then order the NIGC to reconsider the 2015 Decision in light of DOI's letter.  (Joint Proposed Order, ECF No. 50.)  On October 21, 2016, the Court issued an order that incorporated the parties' proposal.  (Am. Order, ECF No. 60.)

On December 9, 2016, defendants certified that DOI had provided them with a letter pursuant to the Court's order (the "DOI Letter").  (Notice of *In Camera* Submission to Ct., ECF No. 63.)  The NIGC issued a letter on January 12, 2017, stating that the DOI Letter did not provide grounds for reconsideration of the 2015 Decision (the "2017 Decision").  (Emergency Mot. to Enforce Oct. 21, 2016 Am. Order & for Order to Show Cause Ex. 1, ECF No. 67-1.)  The Tribe challenged the 2017 Decision as violative of the Court's October 21, 2016 Order and the parties' agreement.  (Emergency Mot. to Enforce Oct. 21, 2016 Am. Order & for Order to Show Cause, ECF No. 67; Reply to Opp. to Emergency Mot., ECF No. 69.)  The Court denied the Tribe's motion, ruling that defendants had complied with both the parties' agreement and the order.  *Fort Sill Apache Tribe v. NIGC*, 234 F. Supp. 3d 209, 211 (D.D.C. 2017).

The Tribe again moved for leave to amend its complaint.  (Mot. for Leave to Am. 1st Am. Compl., ECF No. 74.)  The Court granted the Tribe's motion.  (Minute Order, July 7, 2017.) The Second Amended Complaint reasserted the three counts from the First Amended Complaint and added a fourth, alleging that the 2017 Decision was arbitrary and capricious and unsupported by substantial evidence.  (2d Am. Compl. ¶¶ 121–85, ECF No. 80.)  Defendants moved for dismissal of Counts 2, 3, and 4 of the Second Amended Complaint and for the Court to reconsider its minute order granting the Tribe's motion to amend.  (Defs.' Mot. for Recons. & Partial Dismissal of Pl.'s 2d Am. Compl., ECF No. 84.)  On May 25, 2018, the Court granted in part and denied in part defendants' motion.  *Fort Sill Apache Tribe*, 317 F. Supp. 3d at 516.  The Court dismissed the Tribe's claims that the NIGC acted arbitrarily and capriciously by forcing closure of the Akela Flats facility (Count 2) and that defendants violated the settlement agreement in the Comanche litigation (Count 3), but it refused to dismiss the Tribe's challenge to the 2017 Decision (Count 4).  *Id.* at 512–16.

The Tribe also moved to complete and supplement the administrative record with documents relating to the 2017 Decision, including the DOI Letter.  (Mot. to Complete & Suppl. the Admin. R., ECF No. 102.)  On November 28, 2018, the Court granted the Tribe's motion with respect to 39 documents submitted by the Tribe to DOI but denied the motion as to the DOI Letter, holding that the letter was protected by the attorney-client privilege.  *Fort Sill Apache Tribe v. NIGC*, 345 F. Supp. 3d 1, 7–10 (D.D.C. 2018).

The parties have filed cross-motions for summary judgment on Counts 1 and 4 of the Second Amended Complaint.  (*See* Pl.'s Mot. for Summ. J., ECF No. 115 ("Pl.'s Mot."); Defs.' Cross-Mot. for Summ. J., ECF No. 118 ("Defs.' Mot.").)  The motions have been fully briefed. (*See* Defs.' Resp. to Pl.'s Mot., ECF No. 119; Pl.'s Resp. to Defs.' Mot., ECF No. 126 ("Pl.'s

Resp."); Pl.'s Reply to Defs.' Resp., ECF No. 127; Defs.' Reply to Pl.'s Resp., ECF No. 129

("Defs.' Reply").)  The only issue now before the Court is whether the NIGC's decisions that the

Fort Sill Apache Tribe is not entitled to engage in gaming at Akela Flats pursuant to the IGRA's

initial reservation exception or the restored lands exception violate the APA.

## ANALYSIS

## I.    LEGAL STANDARD

A court normally reviews a motion for summary judgment under the standard provided

by Federal Rule of Civil Procedure 56.  In cases such as this involving a challenge to agency

action under the APA, however, Rule 56 does not apply.  *Stewart v. Stackley*, 251 F. Supp. 3d

138, 155 (D.D.C. 2017).  Instead, the standard contained in the statute governs:  A court is

required to hold an agency action unlawful when it is, *inter alia*, "arbitrary, capricious, an abuse

of discretion, or otherwise not in accordance with law," or "unsupported by substantial

evidence."  5 U.S.C. § 706(2)(A), (E).

An agency rule is arbitrary and capricious

> if the agency has relied on factors which Congress has not intended
> it to consider, entirely failed to consider an important aspect of the
> problem, offered an explanation for its decision that runs counter
> to the evidence before the agency, or is so implausible that it could
> not be ascribed to a difference in view or the product of agency
> expertise.

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983).  This

standard of review is "highly deferential" and "presumes the validity of agency action."  *Nat'l*

*Ass'n of Clean Air Agencies v. EPA*, 489 F.3d 1221, 1228 (D.C. Cir. 2007) (citation, alteration,

and internal quotation marks omitted).  A court will not invalidate an agency action provided that

the agency "explain[ed] the evidence which is available, and . . . offer[ed] a rational connection

between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 52 (citation and internal quotation marks omitted).

"[A]gency action is unsupported by 'substantial evidence' only when it lacks what 'a reasonable mind might accept as adequate to support a conclusion.'" *Int'l Internship Programs v. Napolitano*, 853 F. Supp. 2d 86, 96 (D.D.C. 2012) (quoting *Schoenbohm v. FCC*, 204 F.3d 243, 246 (D.C. Cir. 2000)).  This standard "is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).

Contrary to these well-established legal principles, the Tribe argues that the NIGC's opinions concluding that it may not engage in gaming at Akela Flats pursuant to the IGRA's initial reservation and restored lands exceptions "are entitled to no deference in this proceeding" and the Court should instead review the NIGC's rulings *de novo*.  (Pl.'s Mot. at 38–39.)  It appears that the Tribe argues for *de novo* review based on the claim that both the NIGC and DOI are charged with administering the IGRA.  (*Id.*)  The Tribe correctly asserts that "where multiple agencies are charged with administering a statute, a single agency's interpretation is generally not entitled to *Chevron* deference; instead, the court must review the agency's interpretation *de novo*." *New Life Evangelistic Ctr., Inc. v. Sebelius*, 753 F. Supp. 2d 103, 122 (D.D.C. 2010). But DOI and the NIGC are not separate agencies; the NIGC is an entity within DOI.  25 U.S.C. § 2704(a) ("There is established within the Department of the Interior a Commission to be known as the National Indian Gaming Commission.").  Moreover, the principle only applies where a court is reviewing an agency's *interpretation* of a statute and does not apply to the review of other parts of an agency's decision.  As will be discussed *infra* Section II.A, the only

statutory term at issue in this case, "the Federal acknowledgment process," is unambiguous, and *Chevron* deference is inapplicable. Therefore, the Court cannot review the NIGC's determinations *de novo*, but must decide whether the agency has complied with § 706(2)(A), (E), as interpreted by the Supreme Court and the D.C. Circuit.

## II.   THE INITIAL RESERVATION EXCEPTION

### A.   The NIGC properly interpreted the term "the Federal acknowledgement process."

The Tribe's challenge to the NIGC's application of the initial reservation exception centers on the NIGC's interpretation of the term "the Federal acknowledgement process." The Tribe argues that the phrase is ambiguous, since it was not explicitly defined by Congress, and that the Indian canon of construction requires the Court to construe the term liberally in favor of the Tribe. (Pl.'s Mot. at 40.)

With regard to this issue, the 2008 Opinion stated:

> The Tribe argues that the exception applies to all federal actions that result in the recognition of a tribe. The Tribe argues that the term "federal acknowledgment process" is ambiguous. Under this theory, the Tribe attempts to argue that statutory rules of construction enable it to interpret "federal acknowledgement process" under a plain meaning standard and that the phrase means any federal action that constitutes recognition. However, "federal acknowledgment process" is a term of art that is commonly understood to refer to the regulations adopted by the Secretary in Part 83. "It is a well-established rule of statutory construction that when Congress uses a term of art . . . unless Congress affirmatively indicates otherwise, we presume Congress intended to incorporate the common definition of that term." *United States of America v. Dante Vargas-Amaya*, 389 F.3d 901, 904 (9th Cir. 2004).

> Further, the recognition of tribes prior to the development and implementation of the BIA's federal acknowledgment regulations cannot fairly be identified as a process. It was, in fact, this lack of process that required the development of the process now contained in 25 C.F.R. Part 83. . . . The purpose of these procedures is t[o] "establish a departmental procedure and policy for acknowledgment that certain American Indian tribes exist."

[Procedures for Establishing that an American Indian Group Exists
as an Indian Tribe, 40 Fed. Reg. 39,361, 39,362 (Sept. 5, 1978).]

The Tribe may not claim this exception because it was not
recognized through the Federal acknowledgment process. . . .

(AR 72–73)  The 2015 Decision explicitly adopted the above reasoning and conclusion of the

2008 Opinion and affirmed the Chairman's decision that Akela Flats is not gaming-eligible

under the initial reservation exception.  (AR 3162–63)

Because the NIGC correctly concluded that the phrase "the Federal acknowledgment

process" is not ambiguous, it did not err in denying the Tribe the benefits of the initial

reservation exception.  When reviewing an agency's interpretation of a statute it administers, a

court applies the familiar two-part framework outlined in *Chevron, U.S.A., Inc. v. Natural*

*Resources Defense Council, Inc.*, 467 U.S. 837 (1984).  At the first step, a court "determine[s]

'whether Congress has directly spoken to the precise question at issue,' and . . . 'give[s] effect' to

any 'unambiguously expressed intent.'"  *Am. Bankers Ass'n v. Nat'l Credit Union Admin.*, 934

F.3d 649, 662 (D.C. Cir. 2019) (quoting *Chevron*, 467 U.S. at 842–43 & n.9).  If the statute is

ambiguous, a court proceeds to the second step and "determine[s] 'whether the agency's answer'

to the question 'is based on a permissible construction of the statute.'"  *Id.* (quoting *Chevron*,

467 U.S. at 843).

Section 20(b)(1)(ii) provides that § 20(a)'s general prohibition on gaming "will not apply

when . . . lands are taken into trust as part of . . . the initial reservation of an Indian tribe

acknowledged by the Secretary under the Federal acknowledgment process."  25 U.S.C.

§ 2719(b)(1)(ii).  The phrase "the Federal acknowledgment process" is not defined elsewhere in

the statute.  However, contrary to the Tribe's assertion, "the absence of a statutory definition

does not render a word ambiguous."  *Petit v. U.S. Dep't of Educ.*, 675 F.3d 769, 781 (D.C. Cir.

2012) (citation and internal quotation marks omitted).

At the first step of the *Chevron* analysis, "a court must exhaust the traditional tools of statutory construction to determine whether Congress has spoken to the precise question at issue." *Id.* (citation and internal quotation marks omitted).  The first of these tools is the statutory text, *id.*, which a court construes based on the ordinary meaning of the term and "the structure and context of the statutory scheme of which it is a part." *Cty. of Los Angeles v. Shalala*, 192 F.3d 1005, 1014 (D.C. Cir. 1999) (citation and internal quotation marks omitted); *see also Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 486 (2006) ("Interpretation of a word or phrase depends upon reading the whole statutory text, considering the purpose and context of the statute, and consulting any precedents or authorities that inform the analysis.").  In this vein, defendants argue that "[t]he use of the singular definite article 'the'" ahead of "Federal acknowledgment process" "makes clear that [the] IGRA contemplates a specific singular acknowledgment process—not one of the many ad-hoc methods by which tribes had been recognized historically."  (Defs.' Mot. at 14.)  Indeed, "the" is defined as "a function word to indicate that a following noun or noun equivalent is definite or has been previously specified by context or by circumstance." "the," Merriam-Webster.com Dictionary, https://www.merriam-webster.com/dictionary/the (last visited April 28, 2020); *see also Neilsen v. Preap*, 139 S. Ct. 954, 965 (2019) (citing the Merriam-Webster's Collegiate Dictionary definition of the word "the").  The meaning of the phrase "the Federal acknowledgment process" must have been "previously specified" by a source other than the statute.

The Tribe argues that because the phrase does not appear elsewhere in the IGRA or in the legislative history, it has not previously been specified.  (Pl.'s Resp. at 11.)  But the Tribe ignores the greater context of the statute.  The Court presumes that Congress "is knowledgeable about existing law pertinent to the legislation it enacts, and the Part 83 regulations were longstanding

16

by the time Congress enacted [the] IGRA in 1988." *Frank's Landing Indian Cmty. v. NIGC*, 918

F.3d 610, 616 (9th Cir. 2019) (citing *South Dakota v. Yankton Sioux Tribe*, 522 U.S. 329, 351

(1998), for the first proposition).  Because no single process for federal recognition existed

before the promulgation of 25 C.F.R. Part 83 and because Congress was aware of the process

established by those regulations, it follows that Congress intended "the Federal acknowledgment

process" to mean the process prescribed by 25 C.F.R. Part 83.

This conclusion is bolstered by the other language and structure of the initial reservation

exception.  The exception applies to "Indian tribe[s] *acknowledged by the Secretary under the*

*Federal acknowledgment process*."  25 U.S.C. § 2719(b)(1)(ii) (emphasis added).  All

recognized tribes, regardless of the process by which they were recognized, are "acknowledged

by the Secretary."  Thus, if Congress meant to extend the benefits of the initial reservation

exception to all federally recognized tribes, it would not have needed to add the phrase "the

Federal acknowledgment process" to the end of the exception.  Instead, it could have simply

stated that the exception applies to "Indian tribe[s] acknowledged by the Secretary."  But a court

must, "if possible," "construe a statute so as to give effect to 'every clause and word,'" *Amoco*

*Prod. Co. v. Watson*, 410 F.3d 722, 733 (D.C. Cir. 2005) (quoting *United States v. Menasche*,

348 U.S. 528, 538–39 (1955)), and therefore, the phrase "the Federal acknowledgment process"

must serve to limit application of the exception.

This conclusion is consistent with that of the Ninth Circuit and two other district courts.

In both *County of Amador v. DOI* and *Koi Nation of Northern California v. DOI*, the Ninth

Circuit and Chief Judge Howell, respectively, held that the restored lands exception of the IGRA

was not limited to tribes that had achieved recognition through the Part 83 process, for, unlike

the initial reservation exception, Congress did not explicitly limit the restored lands exception to

17

tribes acknowledged by "the Federal acknowledgment process." 872 F.3d 1012, 1030 (9th Cir. 2017); 361 F. Supp. 3d 14, 47 (D.D.C. 2019). Similarly, in *Grand Traverse Band of Ottawa & Chippewa Indians v. U.S. Attorney for the Western District of Michigan*, the district court concluded that some tribes may qualify to conduct gaming under both the initial reservation exception and the restored lands exception, and, in doing so, it found that the former "expressly references a federal administrative process, 25 C.F.R. Part 83." 198 F. Supp. 2d 920, 932 (W.D. Mich. 2002), *aff'd*, 369 F.3d 960 (6th Cir. 2004). Although, as the Tribe points out, the meaning of the phrase "the Federal acknowledgment process" was not contested in these cases, the courts' observations are persuasive, and the Tribe has not cited any contrary authority.

Accordingly, based on the statutory text, structure, and context, the NIGC correctly concluded that the phrase "the Federal acknowledgment process" is unambiguous and reflects Congressional intent to limit the IGRA's initial reservation exception to tribes acknowledged through the process prescribed by 25 C.F.R. Part 83. Because the Tribe was not federally recognized through that process, the NIGC's decision that the Tribe does not qualify to conduct gaming at Akela Flats under that exception is not contrary to law under the APA.

## B.  The record does not show a disagreement between the NIGC and DOI.

The Tribe also argues that the initial reservation exception should apply to allow gaming at Akela Flats because the Solicitor's Office of DOI allegedly disagrees with the NIGC's determination, and only DOI has the authority to decide issues concerning Indian lands. (Pl.'s Mot. at 41.) The Tribe infers "the *fact* of disagreement" (Pl.'s Resp. at 8 (emphasis in original)) between DOI and the NIGC from the 2017 Decision, where the NIGC states, "After careful consideration of the [DOI Letter], we have determined there are no grounds, for settlement purposes, for reconsideration of the [2015 Decision]." (Emergency Mot. to Enforce Oct. 21, 2016 Am. Order & for Order to Show Cause Ex. 1.) According to the Tribe, "[r]eference to

'consideration' of its opinion suggests . . . [that DOI is] in disagreement with the NIGC's view."

(Pl.'s Mot. at 41.)  Mere consideration of the DOI Letter, however, does not suggest, let alone

show, a disagreement between DOI and the NIGC.[10]  Indeed, regardless of whether DOI agreed

or disagreed with the NIGC, the NIGC was required by the Court's order to consider DOI's

position when reconsidering the 2015 Decision.  (*See* Am. Order at 1–2 ("[T]he NIGC shall

reconsider its Decision and Order dated May 5, 2015, *in consideration of the letter to be*

*provided by [DOI]* . . . ." (emphasis added)).)  As found by Judge Collyer, the parties met the

terms of the agreement and were therefore in compliance with the Court's order.  *Fort Sill*

*Apache Tribe*, 234 F. Supp. 3d at 211.  Further, that Court found the DOI Letter was privileged

and not part of the administrative record.  *Fort Sill Apache Tribe*, 345 F. Supp. 3d at 7–8.

Therefore, the Tribe's suppositions about the contents of the DOI Letter cannot support an

argument that the Office of the Solicitor of DOI disagreed with the NIGC.[11]

---

[10] The Tribe also suggests that DOI "depart[ed] from [its] statutory and regulatory duties" in allowing the NIGC to issue a decision on the Tribe's gaming ability at Akela Flats.  (Pl.'s Mot. at 41.)  To support this argument, the Tribe points to a 2008 letter from the Solicitor of DOI to the Chairman of the NIGC, in which the Solicitor expresses disagreement with an NIGC opinion regarding another tribe's ability to game.  (AR 2574–78)  The letter serves to inform the NIGC that the Secretary "is invoking his authority referenced in 43 C.F.R. § 4.5 to review [the NIGC opinion]."  (AR 2574)  This letter, which was issued in an unrelated case, does not show that the NIGC acted in excess of its statutory authority in this case.  The Chairman of the NIGC is authorized under 25 U.S.C. § 2713 to fine tribes that conduct gaming in violation of the IGRA and provides that an aggrieved party may appeal a fine to the full NIGC.  25 U.S.C. §§ 2713(a)(1)–(2).  That is precisely what occurred here:  The Chairman issued NOV-09-35, imposing a fine on the Tribe for gaming at Akela Flats in violation of the IGRA, and on appeal the full NIGC upheld NOV-09-35 in the 2015 Decision and, thereafter, in the 2017 Decision. The Tribe points to no statutory or regulatory requirement that DOI concur with the NIGC before the NIGC's decision becomes binding.  Instead, the regulations merely provide that the Secretary *may* review NIGC decisions.  43 C.F.R. § 4.5(a)(2).

[11] To the extent the Office of the Solicitor of DOI has made any non-privileged statements regarding the NIGC's position in this case, the Solicitor has concurred with the 2008 Opinion and the 2009 Opinion.  (AR 1257, AR 1416)

III.     **THE RESTORED LANDS EXCEPTION**

To conduct gaming pursuant to the IGRA's restored lands exception, a tribe must show

that (1) the tribe's federal recognition has been restored and (2) the land at issue was placed in

trust as part of a "restoration of lands" for the tribe.  25 U.S.C. § 2719(b)(1)(B)(iii); *Butte Cty. v.*

*Chaudhuri*, 887 F.3d 501, 507 (D.C. Cir. 2018).  The first element is met when a tribe shows (1)

a history of government recognition, (2) withdrawal or termination of that recognition, and (3) a

reinstatement of recognition.  *Grand Traverse Band of Ottawa & Chippewa Indians v. U.S.*

*Attorney for the Western District of Michigan*, 369 F.3d 960, 967 (6th Cir. 2004).  Whether lands

qualify as "restored" under the exception depends on (1) "the factual circumstances of the

acquisition," (2) "the location of the acquisition," and (3) "the temporal relationship of the

acquisition to the tribal restoration."  *Butte Cty.*, 887 F.3d at 507; *Grand Traverse Band of*

*Ottawa & Chippewa Indians*, 198 F. Supp. 2d at 935.

In the 2008 Opinion, the NIGC determined that the Tribe could not conduct gaming

pursuant to this exception because the Tribe failed to show that it is a restored tribe and that

Akela Flats is restored land.  (AR 58–70)  With regard to the first element, the NIGC rejected the

Tribe's argument that its ancestors' imprisonment proved that its government-to-government

relationship had been terminated.[12]  (AR 59–60)  With regard to the second, the NIGC concluded

that all three restored lands factors weighed against a conclusion that Akela Flats qualifies as

restored land.  (AR 61–70)  As to the first factor, the NIGC found the fact that the Tribe had

purchased seven parcels of land in Oklahoma, totaling over eighty-two acres for over $100,000,

before it purchased Akela Flats undercut any argument that "poverty and a difficult time with the

---

[12] The 2009 Opinion came to the same conclusion regarding the termination of its federal
recognition.  (AR 39–43)

land-into-trust process" prevented it from investing in Akela Flats sooner.  (AR 63–65)  The

agency concluded that

> the acquisition of so many Oklahoma parcels of land prior to the
> purchase of Akela Flats is contrary to an assertion of hardship and
> a claim that Akela Flats is part of the Tribe's initial attempts to
> rebuild its land base.

(AR 65)

Although Akela Flats was historically significant to the Tribe, the NIGC concluded that

the second factor also weighed against the Tribe because the Tribe did not show that it had

modern connections to Akela Flats.  (AR 67–70)  In doing so, the NIGC rejected the Tribe's

argument that its ancestors' forced removal from the area mitigated its lack of modern

connections with Akela Flats:

> The Tribe's forced removal from their aboriginal territory, and
> subsequent settlement in Oklahoma, helps explain the Tribe's lack
> of modern connections to Akela Flats.  That fact, alone, however,
> fails to explain why the Tribe did not establish any connections to
> the land until 1998.  The Tribe received new recognition in 1976
> but failed to establish modern connections to Akela Flats as a trust
> parcel for another 23 years.  Instead, the Tribe focused on
> obtaining trust land in Oklahoma. . . . [T]he Tribe's evidence of
> connections established to Akela Flats do not include functioning
> government offices.  Nor do the connections established clearly
> indicate that Akela Flats has maintained its significance in the eyes
> of tribal members.  Thus, the Tribe's evidence of modern
> connections to Akela Flats is insufficient.

(AR 70)  Similarly, the NIGC concluded that the third factor, the temporal relationship between

restoration of tribal recognition and acquisition of the land in trust, weighed against the Tribe

because "the Tribe waited 23 years from recognition to acquire Akela Flats and request that it be

placed into trust for gaming."  (AR 63)

The Tribe challenged the NIGC's conclusions as to both elements of the restored lands

exception in its appeal to the full NIGC and moved for the agency to take official notice,

pursuant to 43 C.F.R. § 4.24(b),[13] of an NIGC opinion regarding the applicability of the restored

lands exception to the Karuk Tribe of California and its land in Yreka, California.  (AR 2325–26;

AR 3120–31)  With regard to the Karuk opinion, the Tribe complained that, despite a similar

record to that of the Fort Sill Apaches, the NIGC found that the Karuks met both elements of the

restored lands exception.  (AR 3124–28)  The Tribe requested that the agency "apply the same

principles . . . to find that the Fort Sill Apache [is] a 'restored Tribe,' and that the Tribe's

Reservation lands at Akela Flats are 'restored lands' within the meaning of [the] IGRA."  (AR

3129)

In the 2015 Decision, the NIGC did not address the Tribe's argument regarding the

Karuk Tribe, and it expressed no opinion on the Tribe's claim that its federal recognition had

been withdrawn.  Instead, the agency concluded that, even if the Tribe could show termination of

federal recognition, the NIGC's 2008 Opinion applied the proper legal test set forth in *Grand

Traverse Band of Ottawa and Chippewa Indians*, 198 F. Supp. 2d at 935, and correctly

determined that the Tribe had not shown that Akela Flats is restored land.  (AR 3160–61)

The Tribe mounts three challenges to the NIGC's 2015 Decision.  First, the Tribe argues

that evidence of its ancestors' imprisonment proves termination of its government-to-government

relationship with the United States.  (Pl.'s Resp. at 13–17.)  Because the NIGC did not address or

rely on this element in reaching its conclusion in the 2015 Decision, this issue is not properly

before the Court.  *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947) ("[A] simple but

fundamental rule of administrative law" is "that a reviewing court, in dealing with a

---

[13] 43 C.F.R. § 4.24(b) provides, "Official notice may be taken of the public records of the
Department of the Interior and of any matter of which the courts may take judicial notice."

determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency.").

Second, the Tribe argues that Akela Flats qualifies as restored lands.  (Pl.'s Resp. at 17–20.)  The Tribe raises the same arguments that it raised before the NIGC, namely, that its economic circumstances prevented it from acquiring land at Akela Flats prior to its many purchases in Oklahoma and that its lack of modern connections with the area is justified by the forced removal and imprisonment of its ancestors.  (*Id.*)  As detailed above, the NIGC thoroughly considered these arguments and rejected them in the 2008 Opinion, and its reasoning and conclusions were adopted by the 2015 Decision.  Because the APA does not require more from the agency, the Tribe's argument fails.  *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 52 (A court will not invalidate agency action if the agency explained the relevant data available and provided "a rational connection between the facts found and the choice made." (citation and internal quotation marks omitted)).

Third, the Tribe argues that the NIGC's treatment of the Tribe with regard to the restored lands exception is inconsistent with the agency's treatment of the Karuk Tribe.  Despite the agency's silence on this issue, the Tribe now asks the Court to "decide that, like the Karuk Tribe . . . , the Tribe has indeed met the restored lands element of the exception . . . and [to] use its equitable powers to fashion an appropriate remedy."  (Pl.'s Mot. at 44 (citation, internal quotation marks, and alteration omitted).)

The Court is unpersuaded by the Tribe's argument.  First, 43 C.F.R. § 4.24(b) does not require an agency to take official notice of a fact or public record.  Instead, the regulation merely permits an agency to do so.  *See* 43 C.F.R. § 4.24(b) ("Official notice *may* be taken . . . .").  Second, although the APA prohibits an agency from treating similarly situated parties differently

without providing reasoned justification for the disparate treatment, *Muwekma Ohlone Tribe v. Kempthorne*, 452 F. Supp. 2d 105, 115 (D.D.C. 2006), the record shows that the Karuks and the Fort Sill Apaches are not similarly situated.  Instead, important factual differences exist between the two tribes' relationships with their land.  First, the Karuks were able to mitigate the fact that Yreka had not been their first trust acquisition by showing that its first acquisitions were done to address a dire housing need.  (Supplemental Administrative Record ("Supp. AR") 90)  Although the Fort Sill Apaches argued that their economic situation prevented them from investing in Akela Flats sooner, the NIGC found that the Tribe's evidence did not mitigate the fact that it had made seven Oklahoma purchases before its purchase of Akela Flats.  (AR 63–65)  Second, the Karuks were able to show extensive modern connections to Yreka at the time of its acquisition: Their property in Yreka was located only thirty-eight miles from the Karuks' tribal headquarters; the land was acquired to provide housing for tribal members; and many members were born or educated in, attended tribal meetings in, or resided in Yreka.  (Supp. AR 91–92)  In contrast, the Fort Sill Apaches lacked any modern connection to Akela Flats at the time of its purchase. Unlike the Karuks, all major tribal government offices were located over 540 miles away, and no tribal members lived on or near the land.  (AR 68–70)  Finally, even though the time between the Fort Sill Apache's federal recognition and their trust acquisition of Akela Flats was only one year longer than the time between the Karuks' recognition and its trust acquisition of Yreka, the NIGC concluded that a sufficient temporal relationship existed between the Karuks' restoration and their acquisition at Yreka *because* the first two restored lands factors were satisfied.  (Supp. AR 92)  Since the Fort Sill Apaches cannot satisfy the first or second factor, a similar finding in their favor on the third would not be warranted.  Given these differences, the NIGC was not required to justify its disparate treatment of the tribes.

Finally, assuming *arguendo* that the NIGC should have taken official notice of the Karuk opinion or should have explained why its decision in the Karuk case is not comparable to the Tribe's case, the Court would not remand to the NIGC because there would be only one rational course for the agency to follow on remand.  *Huff v. Vilsack*, 195 F. Supp. 3d 343, 362 (D.D.C. 2016); *see also Donovan v. Stafford Constr.e Co.*, 732 F.2d 954, 961 (D.C. Cir. 1984) (Remand "would serve no purpose" where "only one conclusion would be supportable.").  Given the factual differences between the Karuks' relationship with Yreka and the Fort Sill Apaches' relationship with Akela Flats, there is no reason for the Court to remand.  Accordingly, the Court will uphold the NIGC's ultimate conclusion that the Tribe was not eligible to game at Akela Flats pursuant to the IGRA's restored lands exception.[14]

## CONCLUSION

For the foregoing reasons, the Court will grant defendants' motion for summary judgment and deny the Tribe's motion for summary judgment.  A separate Order accompanies this Memorandum Opinion.



ELLEN S. HUVELLE
United States District Judge

Date:   April 30, 2020

---

[14] In its reply brief, the Tribe suggests that a conclusion otherwise would violate the settlement agreement made between the parties in the Comanche litigation.  (Pl.'s Resp. at 21.)  The Court has already concluded that it does not have jurisdiction over that claim, since only the district court for the Western District of Oklahoma retained jurisdiction over the settlement agreement and therefore its meaning is not for this Court to decide.  *Fort Sill Apache Tribe*, 317 F. Supp. 3d at 513–14.